Don T. ALLEN and Don T. Allen as Executor of the Estate of Helen M. Allen, Deceased, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 13014.

United States Court of Appeals Seventh Circuit.

Nov. 3, 1960.

Joseph R. Barnett, William J. Wills, Milwaukee, Wis., for petitioner. Foley, Sammond & Lardner, Milwaukee, Wis., of counsel.

Charles K. Rice, Lee A. Jackson, A. F. Prescott, Doyd J. Keno, Dept. of Justice, Washington, D. C., for respondent.

Before DUFFY and CASTLE, Circuit Judges, and GRUBB, District Judge.

CASTLE, Circuit Judge.

Don T. Allen, individually, and as executor of the estate of his deceased wife,[1] petitioners, prosecute this appeal from a decision of the Tax Court of the United

---

1. The executor is a petitioner because the returns for the years involved were filed jointly by Allen and his wife, Helen. For convenience the petitioners will be referred to as "taxpayer".

States which determined deficiencies in income tax for the calendar years 1952 and 1953 in the respective amounts of $12,570.66 and $9,974.80, and disallowed a related refund claimed for 1953 in the amount of $681.46. The Tax Court decided that certain amounts sought to be deducted in full as business bad debts, expenses or losses, under Sections 23(a) (1) (A) and (e) (1) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(a) (1) (A), (e) (1), were deductible only to a limited extent as capital losses or non-business bad debts.

These amounts, which taxpayer claims are deductible in full, represent payments taxpayer made to or for the benefit of a Tucson, Arizona, housebuilding corporation and which taxpayer contends were made for business reasons rather than as capital investments. The taxpayer claims that the payments are business losses and expenses and contends that the Tax Court erred in classifying the losses and expenses as capital losses or non-business losses and by failing to apply the proper legal test of classification between business and capital losses.

The contested issues are:

1. Whether the Tax Court applied the correct legal criteria in classifying the amounts involved as capital or non-business losses.

2. Whether the Tax Court was clearly in error in its finding that the advances made by the taxpayer to or on behalf of the Arizona housebuilding corporation were not proximately related to the taxpayer's business.

In 1949 Allen became associated with Mobilhome Corporation of America (hereinafter called Mobilamerica), a California corporation principally owned by Hugh Curran and controlled by him and his brother Roland. Mobilamerica and Curran had developed a process for building small homes on a mass production assembly-line basis and transporting them by truck to prepared residential sites. Mobilamerica sold franchises for use of its process. Allen became its agent and franchise representative, on a commission basis, for an area covering about five midwest states. In the next two years Allen devoted his entire time to this venture, obtained five licensees but earned commissions of less than $10,-000.00. In late 1950 Allen purchased the business and franchise of the Mobilamerica licensee in the Milwaukee, Wisconsin area and thereafter actively and successfully carried on the business of the Milwaukee franchise as a sole proprietor under the name of Don T. Allen Industries.

In January 1952, Hugh Curran informed the taxpayer that he was negotiating a deal to act as a subcontractor in building 100 houses for use at a mine site located about 40 miles from Tucson, Arizona; and he invited the taxpayer to participate in the project. The contract price for the 100 houses was to be about $700,000, of which 95 per cent was to be paid when the houses were delivered, with the balance to be paid when they were accepted; and construction was to begin in about 30 days. The taxpayer accepted the invitation to participate, and, on February 19, 1952, he and Hugh and Roland Curran organized an Arizona corporation to handle the project. This corporation was named Mobilhome Corporation of Tucson (hereinafter called the Tucson corporation).

The stockholders of the Tucson corporation, their proportionate share interest (which continued without change), and the amounts which they paid for these interests, were:

| Taxpayer | 40% | $2,000 cash |
| Hugh Curran | 20% | 1,000 " |
| Roland Curran | 20% | 1,000 " |
| Ned H. Abrams | 10% | Architectural services |
| Frank Keller | 10% | " " |

Total cash paid in $4,000

The officers of the corporation throughout its existence were:

Taxpayer—President and general manager

Roland Curran—Vice president and secretary

Hugh Curran—Treasurer.

The directors were the three last-named individuals, together with Ned H. Abrams and the taxpayer's son.

During the month of February 1952, the Tucson corporation entered into the contract to build the 100 houses; leased a plant site; erected its plant thereon; opened a bank account in which the contributions of the stockholders were deposited; and began its construction operations. The cost of the plant was about $15,000; and in connection therewith, Hugh Curran advanced $22,466.65 to the corporation for plant materials, supplies and inventory. Also on March 17 and April 9, 1952, the taxpayer made cash advances to the corporation in the respective amounts of $5,000 and $2,500; and in addition, during the year 1952, he incurred expenses in connection with the corporation's business for his traveling expenses, promotional expense, telephone tolls, attorney's fees, and salaries and expense of two employees of Don T. Allen Industries, who became employees of the Tucson corporation, all totalling $9,551.36. No promissory note or other evidence of indebtedness was executed to cover any of these 1952 advances and expenses paid by the taxpayer, and no arrangement was made as to any date for repayment, or for payment of any interest thereon.

On April 12, 1952, the Tucson corporation, acting through the taxpayer and Hugh Curran, made financial arrangements with a Phoenix, Arizona, bank, under which the bank agreed to make loans to the corporation, up to a maximum principal amount of $50,000. As a condition precedent to such arrangement, the bank required and obtained a written "Subordination Agreement", which was executed both by the Tucson corporation and by the taxpayer and Hugh Curran, individually. Also, in compliance with a further condition imposed by the bank the taxpayer and Curran each personally guaranteed repayment to the bank of all loans which it might at any time make to the Tucson corporation. In April 1952, pursuant to these arrangements, the bank loaned the corporation $50,000.

During the summer of 1952, the Tucson corporation constructed the 100 houses for the mining site, successfully and on time as planned and derived a substantial profit. By September 1952, the entire $50,000 loan it had received from the bank was fully paid; and also, all the above-mentioned advancements of $22,466.65 which Hugh Curran had made to the corporation for materials and supplies were repaid to him. However, no repayments were made to the taxpayer in respect of any of his advancements which then, exclusive of his $2,000 stock investment, totalled $17,051.36.

In the late summer of 1952, the taxpayer and Hugh Curran decided to expand the operations of the Tucson corporation to include the construction of houses for sale to the public in the residential area of the City of Tucson. In connection with this project the Tucson corporation borrowed $20,000 from the bank. This loan, like the prior one, was covered by the existing loan agreement, and also by the same continuing personal guarantee of the taxpayer and Hugh Curran.

In the latter part of the year 1952, the Tucson corporation began to experience financial and operating difficulties; and the taxpayer then realized that the corporation's prospects for sale of separate houses in the City of Tucson were not good. He sought equalization of the stockholders' advances from Hugh Curran; and thereupon the latter, on December 8 and 24, 1952, advanced a total additional amount of $10,000 to the corporation. As of December 31, 1952, the Tucson corporation had profits and surplus of about $4,600; and the amount owing to the bank had been reduced to $15,000.

Early in January 1953, the taxpayer and Hugh Curran had a conference, at

which they agreed that the operations of the Tucson corporation would be gradually wound up, by completing such houses which were then in process of construction, and by contracting to build such additional houses as would use up the substantial supply of lumber and materials on hand; and that the corporation would then sell its plant properties, pay all its non-stockholder creditors, and then be fully liquidated.

On January 7, 1953, the Tucson corporation renewed and extended the due date for its existing obligation to the bank by executing and delivering a new promissory note for $15,000, which was made payable in 90 days. This promissory note was signed by the taxpayer as the corporation's president; and the loan, like all prior ones, was made subject to the continuing agreement of the taxpayer and Hugh Curran that their own personal claims against the corporation would be subordinated to claims of the bank, and that each of the stockholders personally guaranteed that such loan would be paid. Also, on February 2 and 4, 1953, taxpayer and Roland Curran made additional payments to the Tucson corporation in the amount of $10,000 each, for which no promissory note or other evidence of indebtedness was executed.

Thereafter, the Tucson corporation continued to contract, build and sell houses until April 27, 1953, when it sold its Tucson plant to the lessor of its plant site for the sum of $10,000. The terms of this sale, which were reduced to writing, were (1) That the Tucson corporation's existing lease for the plant site would be cancelled; (2) that the indebtedness of the corporation to the lessor would be deducted from the purchase price; and (3) that the Tucson corporation agreed that all outstanding indebtedness against it "will be paid in full, and that there will be no liens of any kind outstanding against them."

By October 1953, the Tucson corporation had fully paid all its outstanding indebtedness, except $6,500 which was still owing to the Phoenix bank. Under date of October 17, 1953, this bank indebtedness was paid, pursuant to the above-mentioned guarantee of the taxpayer and Hugh Curran, through the following payments made to the Tucson corporation for such specific purpose:

| | |
|---|---|
| Taxpayer | $3,250 |
| Hugh Curran | 1,625 |
| Roland Curran | 1,625 |

In December 1953, promissory notes were executed for the first time by the Tucson corporation, to evidence the amounts of the payments which the taxpayer and the two Currans had made to it in 1953. By that time the corporation had entirely discontinued its operations and had been fully liquidated; and the notes, at the time they were issued, were uncollectible and worthless.

The stock of the Tucson corporation became worthless in the year 1953.

In the joint income tax return of the taxpayer for the year 1952, the taxpayer deducted as "business bad debts" of his Milwaukee proprietorship, the amount of $10,490.38 representing payments and advances to or for the Tucson corporation. This amount included the advancements of $7,500, which he had made to the corporation in March and April, 1952, and also certain expenses totaling $2,990.38 which he had paid to or for the corporation in that year. He also deducted, as a miscellaneous personal item, the amount of $6,560.98 which represented travel and business expenses paid by him for the Tucson corporation during the year 1952.

In the joint income tax return of the taxpayer for the year 1953, the taxpayer deducted as a "long-term capital loss", the amount of his $2,000 investment in the Tucson corporation's stock; and he further deducted, as "business expenses" and "business bad debts" of his Milwaukee proprietorship, the amount of $13,250 which represented the additional payments he had made to the Tucson corporation in that year.

The Commissioner of Internal Revenue allowed the $2,000 long-term loss for the year 1953 which the taxpayer had

claimed with respect to his investment in the Tucson corporation's stock;[2] but he disallowed all the other above-mentioned claimed deductions.

The Tax Court ruled in favor of the Commissioner in all respects, holding that the amounts sought to be deducted were capital contributions deductible as capital losses or, in the alternative, that if any of these amounts represented loans, then any losses incurred in connection therewith were non-business bad debts.[3]

The question presented by this appeal is simply whether the payments made by the taxpayer were directly related to his business and fully deductible as business expenses, losses or bad debts, or whether they were not so related to his business and hence were non-business bad debts or capital losses, limited in deductibility.

■ Insofar as questions of fact are concerned the Tax Court's determination should not be disturbed on appeal unless it is clearly erroneous. Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 475, 64 S.Ct. 249, 88 L.Ed. 171. And the legal criterion to be applied has been clearly and concisely set forth in Commissioner of Internal Revenue v. Doyle, 7 Cir., 231 F.2d 635, 637 as follows:

"We construe the statutory words 'ordinary and necessary expenses' to mean those expenses which economically are an integral part of a business, whether it be lawful or unlawful. Integrality is the test. Disbursements which fail to meet this test, although they may be concomitants to the business as operated by some persons, are not ordinary and necessary expenses thereof within the meaning of sec. 23(a). We ex-

clude and, therefore, hold as nondeductible, expenses which are not an integral part of a business".

This test of integrality—of direct and close relationship—was recognized and applied in Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29.

■ With the exception of the $10,000 the taxpayer paid to the Tucson corporation in February 1953, the record contains ample support for the Tax Court's decision that the payments and advances taxpayer made to or on behalf of the corporation were not an integral part of nor directly or closely related to his business.

The $10,000 paid in February 1953, at a time when the Tucson corporation was being liquidated by its owners, was for the purpose of providing payment in full to its general creditors. The taxpayer was in no way obligated to make such a payment. The condition of the corporation and its business belie any intention of making an investment in the corporation or its business. And the record demonstrates, as taxpayer testified and contends, he made the payment to protect the reputation and credit standing of his Milwaukee business operation, a highly successful venture. Default and bankruptcy of the Tucson corporation under his presidency and management could but reflect adversely on the business reputation of taxpayer's similar Milwaukee enterprise as a sole proprietor. Moreover, the taxpayer had utilized his Milwaukee banking connection for introduction and recommendation to Tucson financial circles. The circumstances of this February 1953, payment corroborated its declared purpose and disclose a direct and close relationship to the taxpayer's business.

■■ Expenditures by a taxpayer to protect an established business are fully

---

2. Taxpayer in the petition to the Tax Court claimed such $2,000.00 should be treated as a business expense or loss and sought a refund on that basis.

3. The Internal Revenue Code of 1939 allows a deduction in full for business expenses [Section 23(a) (1) (A)], busi-

ness bad debts [Section 23(k) (1)], and business losses [Section 23(e) (1)]. Capital losses may be deducted only to the extent of capital gains plus $1,000 of ordinary income. [Section 117(d) (2)]. Non-business bad debts are treated as capital losses. [Section 23(k) (4)].

deductible as ordinary business expense. L. Heller & Son, Inc., 1949, 12 T.C. 1109; Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 and D. W. Klein Co. v. Commissioner, 7 Cir., 123 F.2d 871, relied on by respondent, are not controlling in the instant case since the payments there involved were made to establish or purchase good will or business standing, not to protect existing business reputation and credit. In Dunn & McCarthy, Inc. v. Commissioner, 2 Cir., 139 F.2d 242, followed in Lutz v. Commissioner, 5 Cir., 282 F.2d 614, the limitations of Welch in this respect were pointed out. Nor is Putnam v. Commissioner, 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144 applicable. The $10,000 item here involved does not represent a loss on a guaranty. We are of the opinion that as to this February 1953, $10,000 payment the findings and conclusions of the Tax Court are clearly in error.

None of the remaining payments involved bear the requisite relationship to the taxpayer's business to qualify them for treatment as other than capital losses or non-business losses or bad debts. The Tucson corporation was organized and operated as a separate legal entity. It had its own stockholders, and those holding a majority interest had no connection at all with taxpayer's Milwaukee business. The businesses were separate and distinct, and operated in distant franchised territories. Neither bought or sold to the other. They had no common customers.

Insofar as the taxpayer's representation of Mobilamerica is concerned the record shows no sales by him of Mobilamerica franchises during the tax years in issue. And although the Tucson venture might conceivably have aided him in selling franchises in some remote way there is no showing of direct aid in that connection or even that the taxpayer was still actually engaged in representing Mobilamerica as a franchise salesman.

On facts considerably stronger for the taxpayer claims for business deductions have been disallowed on grounds that the expenses, losses, or bad debts were not connected with the taxpayer's business. Interstate Transit Lines v. Commissioner, 319 U.S. 590, 63 S.Ct. 1279, 87 L. Ed. 1607; Gulledge v. Commissioner, 4 Cir., 249 F.2d 225; Pokress v. Commissioner, 5 Cir., 234 F.2d 146; A. Giurlani & Bro., Inc. v. Commissioner, 9 Cir., 119 F.2d 852.

We have examined the taxpayer's testimony and considered the arguments he advances thereon to the effect that the Tucson venture served his intended future promotion activities in providing an opportunity to demonstrate the advantages of the Mobilamerica process in connection with defense housing projects; the chance it afforded to build the model plant Mobilamerica had designed and recommended; the use of the Tucson venture and plant as a testing laboratory for new methods and materials to the benefit of his Milwaukee operation; and his desire to maintain a close relationship with Hugh Curran, the key man of the Mobilamerica system. These and the other factors which may have motivated the taxpayer are in our opinion remote and do not establish the proximate relationship of the payments to the taxpayer's business essential to meet the requirement for full deductibility as business expenses or losses. In addition, the $3,250 payment made in October 1953, was under compulsion of the guaranty made by the taxpayer and falls within the purview of Putnam. This payment, together with the $2,000 paid for capital stock, the $7500 advanced in 1952 as working capital and the $9,551.36 incurred for expenses in connection with the operation of the Tucson corporation's business were, in our opinion, properly held by the Tax Court to be deductible only to a limited extent as capital losses or non-business losses.

The decision of the Tax Court is reversed as to the $10,000 paid by the taxpayer in February 1953, and is affirmed in all other respects. The proceeding is remanded to the Tax Court for recomputation of the tax deficiency in conformity with the view herein expressed.

No costs in this court to be recovered by either party.

Affirmed in part, reversed in part, and remanded.