Walter I. DODD and Amelia Lee Dodd, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 8379.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 11, 1961.

Decided Jan. 3, 1962.

N. A. Townsend, Jr., Raleigh, N. C. (Poyner, Geraghty, Hartsfield & Townsend, Raleigh, N. C., on brief) for petitioners.

Richard J. Heiman, Atty., Dept. of Justice, Washington, D. C. (John B. Jones, Jr., Acting Asst. Atty. Gen., Meyer Rothwacks and Joseph Kovner, Attys., Dept. of Justice, Washington, D. C., on brief) for respondent.

Before BOREMAN and BRYAN, Circuit Judges, and CRAVEN, District Judge.

BOREMAN, Circuit Judge.

This case is here on a petition for review of a determination by the Tax Court of deficiencies in income taxes for the years 1955, 1956 and 1957. For the years in question, Walter I. Dodd and Amelia Lee Dodd, husband and wife,[1] filed joint income tax returns on an accrual and calendar year basis.

The memorandum findings of fact and opinion of the Tax Court are not officially reported. The evidentiary facts, some of which were stipulated, are undisputed. A brief recital of facts is necessary to an understanding of the questions presented.

Beginning about 1947 and continuing thereafter and during the years involved, Walter I. Dodd operated under the trade name of Carolina Oil Equipment Company as a sole proprietorship. This operation, with principal office and place of business at Raleigh, North Carolina, employed approximately eight to ten persons in 1953 and was engaged in the sale of gasoline pumps, lifts, lubricating equipment, truck tanks, bulk plants and other equipment necessary for dispensing petroleum products. Taxpayer's principal customers were service stations, garages, bulk oil distributors and independent oil dealers.

About 1953 taxpayer was consulted by his son and Roy D. Wallace, an employee, and it was suggested that motor oil, tires and batteries be added to the line of items then being handled. After some hesitation, upon the persuasion of his son and Wallace and after talking to his attorney, it was decided that these suggested items should be added but that a corporation should be formed to handle the new line.

Accordingly, on December 1, 1953, Carolina Oil & Battery Corporation was incorporated under the laws of the State of North Carolina with an authorized capital of $100,000, consisting of one thousand shares of common stock, each share having a par value of $100. At the time of organization, the corporation issued a total of twenty-five shares to the following named persons in the indicated amounts:

| Shareholder | Number of Shares |
| --- | --- |
| Walter I. Dodd, taxpayer | 5 |
| Walter I. Dodd, Jr. | 5 |
| O. Carlyle Ray | 5 |
| E. A. Warren | 5 |
| R. D. Wallace, Jr. | 5 |

Each of these persons paid in $500 for his stock and the corporation started business with a capital of $2,500.

Walter I. Dodd, Jr., is taxpayer's son, and Ray and Warren are his sons-in-law. Wallace is unrelated to taxpayer. All the stockholders except Warren were employees of the taxpayer's equipment business, but Warren had married Dodd's daughter and taxpayer wished to treat his children equally. Wallace had been working for taxpayer as a salesman for a little over two years prior to becoming a stockholder in the new venture. He was elected president of the new corporation and assumed responsibility for managing its battery sales.

The new corporation's oil, battery and tire business and the taxpayer's equipment business were operated from the

1. Mrs. Dodd is a party only because of the filing of joint returns. References to Dodd or taxpayer pertain to Walter I. Dodd.

same address and with the same employees. The two businesses had many common customers and, in some instances, the corporation purchased oil from jobbers and distributors who were equipment customers of the proprietorship. Separate books were maintained for each business and, for the most part, the suppliers for each were different. It was generally known in trade circles and by the joint customers of the corporation and proprietorship that Dodd was connected with both businesses.

Shortly after the corporation was formed, it purchased two trucks for use in its business at an approximate cost of four to five thousand dollars. A bank loan was obtained by the corporation but the record does not reveal the amount thereof. Within a short time after the corporation began operations, it needed funds with which to purchase inventory and meet current operating expenses. Taxpayer began to advance funds for these purposes and continued to make these advances throughout the taxable years involved. In many instances, taxpayer directly paid corporate obligations. The stockholders of the corporation, other than the taxpayer, contributed no additional funds for any purpose. The corporation reimbursed or accounted to Dodd for some of the funds advanced or expended for its benefit.

The corporation did not prove to be a financially successful venture and substantial amounts of the "debt" remained unpaid at the end of each year in question. Dodd admittedly made the advances because he did not feel that the capital contributed by the stockholders and the funds which the corporation could borrow would be sufficient to get the business started and keep it going. He received no collateral, notes, or other evidences of indebtedness; no provision was made for the payment of interest on the advances and no date was fixed for repayment.

Sometime in 1955, the firm that supplied batteries to the corporation closed down its business leaving the corporation as a guarantor of many batteries which it had sold and which proved to be defective. The customers of Carolina Oil & Battery Corporation continued to look to it to make good the guarantees of the defective merchandise and, in order to maintain goodwill, the corporation fulfilled these guarantees. Some of the advances made by the taxpayer to the corporation were used for this purpose.

Dodd opened an account on his books in December of 1953 labeled "Miscellaneous Loans Receivable—Carolina Oil & Battery Corporation." A record was kept in this account of all funds advanced to the corporation or spent for its benefit. The corporation carried on its books the amounts so advanced as "Accounts Payable—Walter I. Dodd." The following schedule indicates the total debits and credits on Dodd's books, the amount claimed as bad debts on the return and charged off by taxpayer on his books for each year, and the debit balance at the close of business each year on December 31, 1953, to December 31, 1957, respectively:

| Year | Debits | Credits | Charged off | Debit Balance December 31 |
|------|--------|---------|-------------|---------------------------|
| 1953 | 1,500.00 | $ 1,000.00 | $ —— | $ 500.00 |
| 1954 | 13,584.94 | 4,678.36 | —— | 9,406.58 |
| 1955 | 20,281.11 | 1,632.80 | 14,027.44 | 14,027.45 |
| 1956 | 26,679.36 | 15,776.07 | 10,903.29 | 14,027.45 |
| 1957 | 27,730.99 | 18,084.55 | 9,646.44 | 14,027.45 |

On the income tax returns filed for the years 1955, 1956 and 1957, taxpayer claimed bad debts in the amounts of $17,134.16, $17,227.40 and $13,811.96, respectively. Included in these amounts were bad debts owed by customers of tax-

payer's proprietorship business which were allowed as a deduction by the Commissioner while the amounts claimed as bad debts and charged off in the corporation's account were disallowed.

At the time of the trial in the Tax Court in September 1960, Carolina Oil & Battery Corporation was still in existence but taxpayer had acquired ownership of all the stock of the corporation during the latter part of 1957 and continued the corporation in business up to the time of the hearing.[2]

Taxpayer's chief contention before the Tax Court and before us has been that he is entitled to deduct from his gross income the advances, both direct and indirect, to the corporation as ordinary and necessary expenses of his sole proprietorship equipment business under Section 162 of the Internal Revenue Code of 1954.[3] The taxpayer also renews his contention made to the Tax Court in the alternative that he should be allowed the deductions as bad debts under Section 166 of the 1954 Code.[4] In his brief filed before this court, he is committed to a statement of the questions presented for determination as follows:

"1. Are the amounts in question deductible under Section 162, Internal Revenue Code, as an ordinary and necessary expense of the oil equipment business conducted by taxpayer as a proprietorship?

"2. In the alternative, are such amounts deductible under Section 166, Internal Revenue Code, as bad debts of the oil equipment business which taxpayer conducted as a sole proprietor?"

To support his argument, taxpayer contends that the expenditures in question were made to protect and preserve the credit and goodwill of his proprietorship, a well established and successful business at the time the corporation was formed. While he does not specifically claim that the corporate entity of the oil, battery and tire business should be wholly disregarded, his position, nevertheless, reduces itself to the contention that his own individual business and that of the corporation were so intertwined as to be virtually one, and the expenses of the corporation (to the extent of the advances not repaid) presumably deductible by the corporation itself, were also deductible expenses of the taxpayer's separate business. He argues that because this close connection was known to the proprietorship customers, the continued success of his individual business was essentially dependent upon payment of the debts of the corporation. Particular emphasis is placed upon the moral responsibility of the new corporation to fulfill its guarantee of the defective batteries sold by it and the fact that some of the advancements to the corporation were used for that purpose to protect the goodwill of both businesses. Dodd testified also that his proprietorship operated under franchises from equipment manufacturers and the franchises would probably be canceled if the credit standing of the Dodd business complex should be adversely affected, that is, if the corporation went into bankruptcy.

Great reliance is placed by the taxpayer on Lutz v. Commissioner, 282 F.2d 614 (5th Cir. 1960), and Allen v. Commissioner, 283 F.2d 785 (7th Cir. 1960), and it

---

2. The Tax Court found that Dodd acquired all the stock at an undisclosed date but Dodd's counsel, at the bar of this court, fixed the date of the acquisition of the stock by the taxpayer as indicated above.

3. "§ 162. Trade or business expenses
"(a) In general.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—* * *.
(26 U.S.C. 1958 ed., § 162.)"

4. "§ 166. Bad debts
"(a) General rule.—
"(1) Wholly worthless debts.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
"(2) Partially worthless debts.— When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.
* * * (26 U.S.C. 1958 ed., § 166.)"

would appear that Dodd has attempted to marshal his facts so they will closely resemble those of the Lutz case.

In Lutz v. Commissioner, 282 F.2d 614, the taxpayer had been successfully engaged for seventeen years as an individual in business as a broker of perishable agricultural produce, operating in the State of Texas. For about the last six years of that period, he was also a grower of agricultural products, operating in the States of Idaho and Oregon. He marketed his goods under his own brands and trade names. During 1947 (the year before the two tax years there involved), some of taxpayer's trusted employees in Idaho and Oregon persuaded him to incorporate his business activities in those two states and he formed three corporations. Certain of the employees desired to acquire interests in the corporations but it is not clear that they actually did so. After the corporations were formed, Lutz continued to conduct the Idaho and Oregon businesses in substantially the same way as before, participating in their management and selling the same products under his same brands and trade names. Instruments of conveyance of real and personal property used in the Idaho and Oregon operations had been executed to the corporations but were withheld from recordation upon explicit instructions from taxpayer. Over the years Lutz had a strong credit position which was an essential factor in his business since he was required to make initial outlays of funds long before he realized any returns from growing crops. The court observed that the corporations had little property which might serve as a basis for establishing independent credit, but we cannot overlook the fact that transfers of assets to the corporations were intentionally unrecorded and thus not exposed to public scrutiny. In the main, so said the court, the business done in Idaho and Oregon during the tax years was bottomed upon the credit standing of Lutz, and the persons who were purchasing the produce coming from those two states were largely the same as the purchasers of the Texas produce who had long been customers of taxpayer. The court stated it was assuming that the Idaho and Oregon businesses were conducted by the three corporations, and we conclude the court must necessarily have assumed also that obligations were being incurred *by the corporations themselves* in connection with their operations. In 1948 and 1949 Lutz paid to creditors of the three corporations substantial sums, and advanced substantial sums directly to the corporations, all of which payments and advances were claimed by him to be deductible as ordinary and necessary expenses of his own personally conducted business. The court stated that the expenses which Lutz claimed as deductions were of the same nature as those incurred and deducted by him in previous years in all of his operations in the three states and that many, if not all, of the creditors were relying exclusively on taxpayer's personal credit, not on the credit of the corporations. The force of this last statement appears to be lessened by the court's assumption of corporate operations and accumulated obligations which taxpayer claims as his personal deductible business expenses. The treatment of these expenditures and advances by the taxpayer consistently indicated his intention to expense them rather than to consider them as loans to the corporations with the right to reimbursement. The court held that the payments and advances were deductible by the individual taxpayer as trade or business expenses. Importantly, the decision is predicated in part on the fact that Lutz was operating his produce brokerage business under a license granted by the Secretary of Agriculture and it was necessary that he pay the debts of his affiliated corporations in order to remain in business under such license in accord with the provisions of 46 Stat. 531 (1930) as amended, 7 U.S.C.A. ch. 20A (§§ 499a–499s) (1958).

With some reluctance we venture the comment that certain ambiguities in the opinion in Lutz make it quite difficult to fully comprehend the rationale of the case. Perhaps the most significant feature of the decision, as we interpret it,

is the conclusion of the court that Lutz was confronted with the certain loss of his license to continue in business in the event he failed to pay the debts and obligations of the three corporations. There was no explicit holding that the corporations were mere shams or were not intended to, and did not, function as separate entities. The court rejected the contention that the facts of the case would appear to require adequate capitalization of the corporations and that the funds expended by Lutz for the corporations were actually contributions to their capital structures.

The facts in Lutz differ somewhat from the facts here. However, concluding as we do that these differences do not provide any real basis upon which the cases may be distinguished, we regret that we must respectfully decline to adopt the Lutz decision as acceptable precedent.

In Allen v. Commissioner, 283 F.2d 785, the taxpayer, operating as an individual, was not allowed to deduct advances to a corporation which was conducting a separate business for the purpose of paying the corporation's obligations while it was in existence. He was allowed, however, a deduction for his advancements to the corporation to be used for the payment of its debts after it was no longer active but was in the process of dissolution. At that point the purpose of the payments was not, as here, to continue the corporation in existence; the *only* purpose of the Allen payments was to protect the taxpayer's credit. In those circumstances, as the court there pointed out, the payments could not be considered an investment in another corporation or its business. The disallowance of advances in the Allen case bears heavily against the allowance of expenditures by Dodd in the instant case. The second holding in Allen, allowing a portion of the claimed deduction, has no application here. The primary purpose of all the Dodd advances was to pay current expenses of the corporation in order to keep it going; any benefits to his own credit rating and goodwill were incidental thereto.

Other cases relied upon by taxpayer are clearly distinguishable from the instant case:

Dunn & McCarthy, Inc. v. Commissioner, 139 F.2d 242 (2d Cir. 1943), involved the assumption and payment by a corporation of loans made to its president by several of its top salesmen to pay the president's gambling debts. The president committed suicide. It was held that the expenditures were properly deductible as ordinary and necessary expenses of the corporation because its continued successful operation depended upon the goodwill protected by the payment of the loans. There the corporation paid the debts as its own obligations in order to maintain the loyalty and high morale of the employees and the goodwill of its customers. The former president's estate was hopelessly insolvent and there was no thought that the corporation was making a loan or an investment in the traditional sense.

In Ray Crowder, 19 T.C. 329 (1952), the Tax Court allowed as expense deductions funds spent by taxpayer individually for operating expenses of a nonprofit mutual aid insurance association which was established as an adjunct of his funeral home business, a sole proprietorship. The Tax Court found that it was the custom in taxpayer's geographical area for funeral homes to operate such insurance associations in order to advertise the funeral homes and their services. Crowder's funeral home business was incorporated and he thereafter continued to advance funds individually as before, which advancements were held to be nondeductible as nonbusiness bad debts or funds expended in the production of income. In Crowder there was no attempt, as in the instant case, to organize, operate and contribute to a new and profitable business which could, at least theoretically, pay and deduct its own business expenses.

Charles J. Dinardo, 22 T.C. 430 (1954), is likewise distinguishable from the instant case in that there a doctor was permitted to deduct as his own expenses contributions to a nonprofit corporation

which operated a private hospital solely for patients of the medical partnership of which he was a member. There it was expressly found by the Tax Court that the operation of the hospital was a factor significantly contributing to the production of income for taxpayer from his medical practice. Thus, the contributed expenses of the hospital corporation were, in a real and direct way, tied into the production of income by taxpayer as a doctor, not as a part owner of the hospital.

In United States v. E. L. Bruce Co., 180 F.2d 846, 849 (6th Cir. 1950), the taxpayer acquired an exterminating business and was allowed to deduct as ordinary and necessary business expenses certain expenditures which were required by its license agreement with the State of California and "by its contract obligation with the parent" company.

L. Heller & Son v. Commissioner, 12 T.C. 1109 (1949), cited with approval in Lutz v. Commissioner, supra,[5] did not involve the payment of current operating expenses of a going business, as in the instant case, but involved the payment by a parent corporation of debts of its subsidiary which had undergone reorganization in bankruptcy.

In Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933), the taxpayer made payments to the creditors of a bankrupt corporation in an endeavor to strengthen his own standing and credit. The Commissioner found that the payments came closer to capital outlays than to ordinary and necessary expenses in the operation of a business. Mr. Justice Cardozo discussed in somewhat general terms the deductibility for tax purposes of ordinary and necessary expenses incurred in carrying on any trade or business. He observed that the problem is not solved when the payments are characterized as necessary and there is need to determine whether they are both necessary and ordinary. At pages 114 and 115, 54 S.Ct. at page 9 he stated:

" * * * Here, indeed, as so often in other branches of the law, the decisive distinctions are those of degree and not of kind. One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. * * *"

At page 116, 54 S.Ct. at page 10 the following appears:

"Many cases in the federal courts deal with phases of the problem presented in the case at bar. To attempt to harmonize them would be a futile task. They involve the appreciation of particular situations, at times with border-line conclusions. * * *"

The Welch case stands clearly for the proposition that the ruling of the Commissioner, which was there upheld, has the support of a presumption of correctness and the taxpayer has the burden of proving it to be wrong.

The Tax Court, in sustaining the Commissioner, held that the funds paid out and advanced by Dodd were not deductible as ordinary and necessary expenses of his own business but were, in fact, contributions to the capital of the newly organized and continuing corporation. We agree.

Dodd advanced funds for the benefit of and to a corporation continuing in existence, not with the knowledge that he would never be reimbursed therefor but, indeed, with the hope and expectation that the corporation could be developed into a financial success from which, in some manner and form, he could ultimately recover his expenditures. There is nothing to indicate that the advancements were treated, or intended to be treated, as expenses of the proprietorship. In fact, everything points to the contrary. The taxpayer carried the advancements on his own books and those of the corporation as debts or loans, not as expenses. The corporation even repaid a portion of these advances. Beginning in 1955 Dodd began claiming the deductions, not as ordinary and necessary expenses but as business bad debts. It does not appear that he had

5. 232 F.2d 614, 617.

ever considered the payments here in question as personal expenses until confronted with the disallowance of his claimed deductions as bad debts.

In addition to the evidence indicating that the expenditures were not expenses of the proprietorship but were in fact made at the risk of the corporate venture, the corporation was patently undercapitalized from its inception, a circumstance which is not without significance though not necessarily controlling. The first purchases of trucks involved approximately twice the amount of paid-in capital. Funds had to be advanced from the very beginning to purchase inventory and to meet current operating expenses. Dodd himself testified that he did not think the original capital together with the amounts which could be borrowed from banks "were going to be sufficient" and he did not think he "should stop before we got started almost." The corporate existence was maintained throughout the tax years in question when the losses continued to multiply, thus lending weight to the Tax Court's conclusion that the advancements were contributions to capital, not expenses to meet the obligations of a liquidating corporation as in Allen, supra. Indeed, in 1957 taxpayer acquired all of the stock of the corporation and continued corporate existence until the hearing in the Tax Court.

We agree with the contention of the Commissioner that it is apparent from the undisputed facts of this case that the primary purpose of the taxpayer's advances to the corporation was to establish a new venture, engaged in a business similar to but essentially different from that of his proprietorship. The success or failure of the corporation in the sale of oil, batteries and tires was only incidentally related to Dodd's main business of selling petroleum distribution equipment. It is not made to appear that the continued existence of the corporation was essential to the proprietorship's continued successful operation although Dodd speculatively testified that his equipment suppliers might discontinue his franchises in the event of the failure of the corporation to discharge its obligations.

█ It is well established that if a taxpayer has voluntarily created a corporation to suit his or its own purposes, such taxpayer may not ignore and disregard the corporate entity when to do so would result in an otherwise unavailable tax benefit. National Carbide Corp. v. Commissioner, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949); Interstate Transit Lines v. Commissioner, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943); Burnet v. Commonwealth Improvement Co., 287 U.S. 415, 53 S.Ct. 198, 77 L.Ed. 399 (1932); Noland v. Commissioner, 269 F. 2d 108 (4th Cir.), certiorari denied 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 121 (1959). The rationale of these decisions is applicable here where the taxpayer made the choice of operating part of his business through the corporate form with the hope that the corporation would be profitable, benefiting particularly his son, sons-in-law and a trusted unrelated employee. Having so chosen, he may not now, because the corporate business entity has proved to be unprofitable, choose to disregard it and deduct its expenses or losses as his own. We are not informed as to the reasons for the formation of a new and separate corporation although it does appear that this course was followed after consultation and advice. As the Supreme Court said in Moline Properties, Inc. v. Commissioner, 319 U.S. 436, at pages 438, 439, 63 S.Ct. 1132, at page 1134, 87 L.Ed. 1499.

> "The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. New Colonial Co. v. Helvering, 292 U.S. 435, 442 [54 S.Ct. 788, 791, 78 L.Ed. 1348];

Deputy v. duPont, 308 U.S. 488, 494 [60 S.Ct. 363, 366, 84 L.Ed. 416]. In Burnet v. Commonwealth Improvement Co., 287 U.S. 415 [53 S.Ct. 198, 77 L.Ed. 399], this Court appraised the relation between a corporation and its sole stockholder and held taxable to the corporation a profit on a sale to its stockholder. This was because the taxpayer had adopted the corporate form for purposes of his own. The choice of the advantages of incorporation to do business, it was held, required the acceptance of the tax disadvantages."

■ Admitting that the corporation in this case was doing a business related to the business of the taxpayer's sole proprietorship, that it used common facilities and employees and had many mutual customers, that its success would enhance the business of the sole proprietorship and improve the morale of the proprietorship employees, or that its failure would reflect upon Dodd's individual credit, these facts do not provide valid reasons for disregarding the corporate entity, as long as it is a continuing business. If the taxpayer here were permitted to deduct, as his personal business expenses, the expenses which were clearly those of the corporation and incurred by reason of its operation, the principle of tax law recognizing the corporate entity would be seriously violated.

■ Dodd makes the alternative claim that he is entitled to the deductions as business bad debts under Section 166 of the 1954 Code, the pertinent provisions of which are shown in footnote 4.[6] This point is not stressed in taxpayer's brief and his counsel virtually conceded, during the argument before this court, that the payments and advancements to the corporation were not loans. Though the books

of the proprietorship and corporation carried the advancements as loans, other indicia of a debtor-creditor relationship, such as notes, arrangement for interest, collateral, or specified repayment dates are absent. Although, during the years from 1953 through 1957, the corporation suffered substantial deficits, the taxpayer continued to advance the funds necessary for it to remain in operation.

The advancements were continued by Dodd despite the fact that portions of the corporate "debts" were being charged off. It is unreasonable to conclude that, under such conditions, a prudent creditor would continue to make unsecured *loans* to a debtor with expectation of repayment. The advances were, as the Tax Court correctly determined, for the "primary purpose of starting and keeping under way, a new and under-capitalized corporation." The expectation of recoupment was obviously bottomed upon the ultimate success of the corporate venture. Based upon these facts, the Tax Court was clearly justified in concluding that the advances in question constituted capital contributions and not loans. Gilbert v. Commissioner, 262 F.2d 512 (2d Cir.), certiorari denied, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959); American-La France-Foamite Corporation v. Commissioner, 284 F.2d 723 (2d Cir. 1960), certiorari denied, 365 U.S. 881, 81 S.Ct. 1031, 6 L.Ed.2d 192 (1961); O. H. Kruse Grain & Milling v. Commissioner, 279 F.2d 123 (9th Cir. 1960).

In Gilbert, *supra*, the court held that whether advances made by a stockholder to a closely held corporation were contributions to capital or were loans is essentially one of fact upon which the taxpayer has the burden of establishing the right to the deduction; that the form of the transaction is not controlling, but rather

6. In his briefs in the Tax Court and in this court, taxpayer refers to § 165 of the 1954 Code as the section dealing with bad debts. However, § 165 deals with losses, bad debt deductions being covered by § 166. There is no overt contention that the advancements constituted losses within the meaning of § 165 although there is one unrelated reference in taxpayer's brief to the principle that business losses are deductible under that section. No apparent effort was made to apply that principle to the facts of this case. Consequently, we deem it unnecessary to comment upon or determine here the applicability of § 165.

the substance; that the loss will be disallowed if it is a loss of risked capital; that the determination of whether the funds are capital contributions or loans must be made in the light of all the facts in a particular case, and rarely should any one element be determinative; and that the answer does not depend on the taxpayer's motive. American-La France-Foamite Corporation involved a fact situation in which the taxpayer sought a deduction for business bad debts based upon advances to his corporation for a period of six years from its inception to its termination, only a portion of which were repaid. In upholding the Tax Court's conclusion that the advances constituted capital expenditures and not debts, the court said:

" * * * viewing in proper perspective the venture from beginning to end, it is difficult to reconcile these large advances, made to a company with no assets of any substance and no prospects other than the success of the venture, as 'loans.' " 284 F.2d 723, 725.

█ Finally, in seeking deductions for bad debts, Dodd is apparently contending that he is entitled to the deductions based on partial worthlessness since the corporation had assets during the years in question to repay at least a portion of the advances. Section 166(a) (2) of the 1954 Code (see footnote 4) provides that the Commissioner may allow a deduction for that part of a debt charged off when he is satisfied it is recoverable only in part. The courts have consistently held that the Commissioner's judgment is controlling unless it is plainly arbitrary or unreasonable.[7] The advances were being continued while at the same time the taxpayer was seeking a deduction for partial worthlessness. Furthermore, he has failed to show any change in the financial condition of the corporation subsequent

to the time when the alleged debts were created which adversely affected the corporation's ability to repay. Even though the taxpayer should contend, which he does not, that the Commissioner abused his discretion in disallowing the claimed bad debt deduction, the facts here would not support such a contention.

The decision of the Tax Court is affirmed.

Affirmed.

---

7. Bullock v. Commissioner, 26 T.C. 276, affirmed per curiam, 253 F.2d 715 (2d Cir. 1958); Findley v. Commissioner, 25 T.C. 311, affirmed per curiam, 236 F.2d 959 (3d Cir. 1956); Wilson Bros. & Co. v. Commissioner, 124 F.2d 606 (9th Cir. 1941); Stranahan v. Commissioner, 42 F.2d 729 (6th Cir.), certiorari denied, 283 U.S. 822, 51 S.Ct. 346, 75 L.Ed. 1437 (1930).