Eva Rubin v. Commissioner.
Rubin v. Commissioner
Docket No. 79722.
United States Tax Court
T.C. Memo 1963-218; 1963 Tax Ct. Memo LEXIS 125; 22 T.C.M. (CCH) 1089; T.C.M. (RIA) 63218; August 20, 1963
Burton L. Williams, 85 Devonshire St., Boston, Mass. for the petitioner. Alexander L. Ross, Jr., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in petitioner's income tax as follows: Year
Amount
1952
$ 2,126.52
1953
4,853.42
1954
10,074.85
1955
2,895.68
1956
393.17 The issues remaining for decision are (1) whether the payments by petitioner's husband to wholly-owned corporations were "business" or "nonbusiness" *126 debts within the meaning of section 166 of the Internal Revenue Code of 1954 and (2) whether they were loans or capital contributions. From anything that appears, the instant petition was filed only by petitioner, who is involved solely because of the filing of a joint return with her husband, notwithstanding that the latter is not a party to this proceeding. Some of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner resides at 800 Newton Street, Chestnut Hill, Massachusetts. Petitioner and her husband, Irving Rubin (hereinafter called Rubin), filed joint returns for the period herein concerned with the district director of internal revenue for the district of Massachusetts at Boston, Massachusetts. Income was reported on a cash basis and for a calendar year. Boston Metal Products Co. (hereinafter called company) was organized by Rubin in 1935 as a sole proprietorship engaged in the business of jobbing metal, glass, and wood products. The principal business activity of the company, which was in continuous operation from 1935 to 1958, was the manufacture and sale of various kinds of equipment *127 for supermarket and commissary use. The company purchased merchandise from a variety of sources and sold its products to a variety of customers. It was basically a one-man operation that required Rubin's full time and effort. During the years in issue, 1952 through 1956, the operations of the company resulted in a net profit exclusive of claimed business bad debt deductions as follows: $6,921.57 in 1952; $17,494.00 in 1953; $24,958.72 in 1954; $17,643.81 in 1955; and $10,208.54 in 1956. Rubin has never considered himself to be a money lender and has never advertised as a money lender, financier, promoter, or organizer of corporate enterprises. In the course of carrying on the company's business, Rubin became financially involved in separate corporate and partnership business enterprises manufacturing metal and glass ventilators; supplying equipment for the distribution of hosiery and insect killer; selling supermarket equipment in Canada; and selling and promoting wooden racks and display items, oven cleanser, a new type of refrigeration unit, barbecue machines, pricing materials for supermarkets, an electronic computer system for stores and warehouses, and a design for a new packing *128 unit. Rubin also joined in a partnership with his brother in jobbing metal, glass, and wood products. He manufactured war materials, worked on several installations of plate glass, and loaned money to an independent concession business, an independent gas station, and an enterprise with a new design for iron lungs. None of Rubin's interests in any of the foregoing enterprises was held by him for sale to customers in the ordinary course of his trade or business. In 1953 Rubin organized Advance Sportswear, Inc. (hereinafter called Sportswear), which was incorporated under the laws of Massachusetts to manufacture sports clothes. Rubin was the sole contributor to the financial structure of the new business and he obtained 100 percent of the stock ownership. His basis for the stock in 1954 was $9,400. The initial contribution to Sportswear was used to start operations, buy materials, pay labor, and the like. Sportswear was a manufacturer of sportswear for sale in supermarkets. From the beginning of the operation, the current liabilities exceeded the assets. Within a month or two after incorporation, additional funds were required to meet the payroll and pay bills. Rubin advanced *129 the necessary funds. Initially Sportswear received some credit from banks and other lending institutions. Rubin's personal guarantee of the debts was required to arrange for these credits. It was understood that the repayment of Rubin's advances would have to depend on the profitable operation of Sportswear. Sportswear never operated at a profit, and it and its wholly-owned subsidiary, Starlet Manufacturing Co. (hereinafter called Starlet), ceased operations in 1954. Rubin made advances to Sportswear and Starlet in the total amounts of $20,888.85 in 1953 and $77,103.38 in 1954. Morris Machine Tool Co., Inc. (hereinafter called Tool) was formed by Rubin as a Rhode Island corporation in 1953 or 1954 to manufacture stamps, machine tool products, and slicers and to act as a subcontractor for the company in manufacturing precision tools. Rubin was the sole stockholder and only contributor to the initial capital structure of Tool. Tool never operated at a profit and ceased operations in 1956. The receipts of Tool were insufficient to meet current operating costs and Rubin found it necessary to advance funds in the hope that increased business might enable Tool to operate at a profit. *130 Repayment of these advances depended on whether there would be a profitable operation. Rubin received a salary of $2,550 from Tool in 1953. Rubin received no certificates of indebtedness for any of the advances to Sportswear and Tool and did not charge any interest to either corporation. No security in the form of a mortgage on the corporate property of either corporation was ever furnished. Sportswear and Tool were proximately related to Rubin's business conducted as Boston Metal Products Co. On the Schedule C filed by petitioner and Rubin with their joint tax return for the years 1954, 1955, and 1956, the following amounts were deducted as "Bad debts arising from sales or services": 1954
$97,992.23
1955
50,504.52
1956
17,428.65 In his deficiency notice respondent determined that these deductions were allowed only as capital items limited to $1,000 a year, thereby eliminating the net operating loss deduction for the years in issue. The deficiency notice also included the following explanations for 1954, 1955, and 1956 and Exhibit A, "Computation [of] Capital Loss Carry-Forward to 1957": 1954 (a) Business profit To disallow bad debt deduction [of $97,992.23] *131 as business bad debts. Deduction was based on advances to Advance Sportswear, Inc. and Starlet Manufacturing Company, subcontractor of and whollyowned subsidiary of Advance Sportswear, Inc., both of which corporations were organized 1/2/53 by two others besides husband-taxpayer. The husband-taxpayer ultimately acquired the interests of the two other stockholders. Operations ceased in 1954 with deficit surplus in excess of capitalization, after assignments for the benefit of creditors. Total cost of stock to this taxpayer was $9,400.00. Limitation capital loss deduction is allowable. Advances were verified as $20,888.85 in 1953 and $77,103.38 in 1954. The taxpayer was not in the money lending business and advances were without interest and were not covered by notes. An additional $13,000.00 was paid as guarantee payments for indebtedness of these corporations in the succeeding year, 1955. 1955 (b) Business profit To disallow bad debt deduction [of $50,504.52] as business bad debts. Deduction was based on advances, without interest and not covered by notes in the amount of $37,504.52 to Morris Machine & Tool Company, Inc. $25,732.46 in 1953; ($772.32) in 1954; and $12,544.38 *132 in 1955 - and the $13,000.00 guarantee payments to creditors of Advance Sportswear, Inc. and Starlet Manufacturing Company referred to in last sentence, item (a), covering year 1954. 1956 (b) Business profit To disallow bad debt deduction [of $17,428.65] as business bad debts. Deduction was based on guarantee payments to creditors of Morris Machine & Tool Company, referred to in item (b), Year 1955. General comments, item (a), Year 1954 apply. EXHIBIT A Computation Capital Loss Carry-Forward to 1957
1954
Worthless stock (return) - Advance Sports-
wear, Inc., Starlet Manufacturing Co.
($ 9,400.00)
Loss on government bonds (return)
(68.60)
Non-business bad debt - disallowed business
bad debt
(97,992.32) *
Limitation capital loss applied
1,000.00
1954 Capital loss carry-over to 1955
($106,460.92)
1955
1954 carry-over, above
($106,460.92)
Net long term capital loss: Boston Metal Products Company, Ltd. -
cost $5,000.00 - proceeds $7,925.42
$ 2,925.42
Morris Machine & Tool Co., Inc. - cost -
$6,883.00 - proceeds - none
(6,883.00)
Financial Industrial Fund, Inc. (return)
17.00
Non-business bad debt - disallowed business
bad debt
(50,504.32) *
Limitation capital loss applied
1,000.00
1954 and 1955 carry-over losses to 1956
($159,905.82)
1956
1954 and 1955 carry-overs, above
($159,905.82)
Non-business bad debt - disallowed business
bad debt
(17,428.65)
Limitation capital loss applied
1,000.00
1954, 1955 and 1956 carry-over to 1957
($176,334.47)
*133 Rubin's payments to or on behalf of Sportswear and Tool during the years in issue were not capital contributions to those corporations. Sportswear's stock became worthless in 1954 and Tool's stock became worthless in 1955, as did the debts owed by them to, or guaranteed by, Rubin. Opinion While not entirely free from doubt, we think that the debts incurred through advances to Tool and Sportswear by Rubin were proximately related to the latter's individual trade or business and that, as a result, the losses incurred are entitled to be treated as business bad debts [1] within the meaning of section 166, I.R.C. 1954. *134 Rubin, "being a sole proprietor, does not run afoul of such cases as Burnet v. Clark, 287 U.S. 410 * * *, that a business is not that of the taxpayer but of a separate corporation." MacLevine, 31 T.C. 1121, 1126 (1959). And see Whipple v. Commissioner, 373 U.S. 193 (1963), rehearing denied - U.S. - (June 17, 1963). The new products that Sportswear and Tool were to manufacture were an integral part of Rubin's individual business of distributing and wholesaling goods to supermarkets. As such, the activities of Sportswear and Tool were proximately related [2] to Rubin's individual business. J. T. Dorminey, 26 T.C. 940 (1956); Wilfred J. Funk, 35 T.C. 42 (1960); Mac Levine, supra; see also Tulane Hardwood Lumber Co., 24 T.C. 1146 (1955); Western Wine & Liquor Co., 18 T.C. 1090 (1952); Bagley & Sewall Co., 20 T.C. 983 (1953), affd., 221 F.2d 944 (C.A. 2, 1955). The mere fact that the two corporations may, in addition, have made sales to independent customers "does not at all detract from the substantial part that [they were] intended to play" in Rubin's business. *135 Wilfred J. Funk, supra at p. 49. This result eliminates the necessity of further consideration of petitioner's alternative contention that Rubin was actively engaged in the trade or business of promoting and organizing corporations. See Whipple v. Commissioner, supra.But Whipple lends support to the principal contention here, as J. T. Dorminey, supra, was there (footnote 11) referred to with apparent approval.
Respondent attempts to argue, and has *136 stated on opening statement, [3] that the Government in disallowing the business bad debt deduction is not limiting itself to a claim that they are in fact nonbusiness bad debts. The Government is also arguing that these are * * * contributions to capital as opposed to bad debts * * *. In the face of respondent's deficiency notice, characterizing the advances as nonbusiness bad debts, this argument is more than a new issue. It is inconsistent with the determination of the deficiency and was never pleaded as an alternative. "The Commissioner must plead affirmatively, must assume the burden of proof and, if necessary, claim an increased [deficiency] whenever he asks the Court to take a position inconsistent with * * * that taken * * * in determining the deficiency." Cedar Valley Distillery, Inc., 16 T.C. 870, 879 (1951). Even had the pleadings raised this new issue, respondent *137 would have been required to state this allegation affirmatively in his answer. This would have afforded petitioner an opportunity to plead surprise, which, of course, under the circumstances, she was not required to do. The contention that there was no bad debt at all would then constitute new matter within the scope of Rule 32, Tax Court Rules of Practice."To that extent, the burden of proving the necessary facts [would be] upon respondent." George B. Markle, Jr., 17 T.C. 1593, 1599 (1952). Wadsworth R. Lewis, 34 B.T.A. 996 (1936). That, even then, this factual determination would place a heavy burden on respondent is evidenced by recent conflicting circuit court decisions in cases in which petitioner rather than respondent had the burden. Cf. American-La France-Foamite Corporation v. Commissioner, 284 F. 2d 723 (C.A. 2, 1960), certiorari denied 365 U.S. 881, and Dodd v. Commissioner, 298 F. 2d 570 (C.A. 4, 1962), both affirming Memorandum Opinions of this Court, with Lutz v. Commissioner, 282 F. 2d 614 (C.A. 5, 1960), and Bodzy v. Commissioner, 321 F. 2d 331 (C.A. 5, Jul. 10, 1963), *138 both reversing Memorandum Opinions of this Court. And, bearing in mind that it is respondent and not petitioner who must be held to the inadequacies in the record before us, we have found that these advances were not capital contributions. George B. Merkle, Jr., supra; see also Fred A. Bihlmaier, 17 T.C. 620 (1951). Respondent's computation of the capital loss carry-forward in his deficiency notice is not questioned. It concedes both the worthlessness and the amount of claims against Sportswear and Tool. In the absence of proof to the contrary, we accept these facts. Decision will be entered for the petitioner. Footnotes
*. The discrepancy is unexplained.↩
1. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
2. "The question whether a debt is a nonbusiness debt is a question of fact * * * [and] shall * * * be [determined] in substantially the same manner for determining whether a loss has been incurred in a trade or business for purposes of section 165(c)(1). * * * [The] character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception * * *." Sec. 1.166-5(b)(2), Income Tax Regs.↩
3. But petitioner's opening statement makes clear her view of the sole issue: "[The] issue in this case is whether or not the petitioner * * * suffered a business or nonbusiness [bad] debt."↩