In re the RECEIVERSHIP ESTATE OF INDIAN MOTORCYCLE MANUFACTURING, INC. a New Mexico Corporation.

No. CIV.A.02–11522–REK.

United States District Court, D. Massachusetts.

June 6, 2003.

---

Peter Sklarew, Thomas P. Cole, U.S. Dept. of Justice, Washington, D.C. for the United States, Internal Revenue Service.

John M. Tanner, Fairfield & Woods, PC, Denver, CO, for Sterling Consulting Corporation, a Colorado corporation, as receiver for the Indian Motorcycle Manufacturing Inc., a New Mexico corporation.

Kurt W. Hague, Richard W. Rehehan, Rudolph F. Pierce, Goulston & Storrs, PC, Boston, MA, for Michael Mandelman.

Paul D. Moore, Duane Morris LLP, Boston, MA, for Stephen M. Rodolakis, Chapter 7 Trustee for Indian Motocycle Company, Inc., Indian Motocycle Apparel and Accessories Co., Inc. and Indian Motocycle Manufacturing Company, Inc.

## MEMORANDUM IN EXPLANATION AND PRACTICE AND PROCEDURE ORDER

### Order No. 5

KEETON, Senior District Judge.

A **Case Management Conference** (CMC) in these Consolidated Proceedings was held on May 29, 2003. Rulings then made are recited below. The next CMC is set for **Tuesday, July 15, 2003 at 10:00 a.m.,** in **Courtroom 3** of the **United States District Court for the District of Massachusetts.**

The **next CMC** after that will be set at the CMC on **July 15, 2003.**

*Practice and Procedure Order No. 5 supplements and does not supercede Practice and Procedure Orders Nos. 1, 2, 3, and 4.*

### Proceedings at Previous Case Management Conferences

### I.

At the Case Management Conferences (CMC) held on November 15, 2002, April 2, 2003, and May 29, 2003, the court heard arguments on the following motions. The court notes below intervening dispositions or rulings made in this PPO. Also, in chronological order of filing, dispositions of other motions in this PPO before issuance of this PPO are noted.

(1) Receiver's Motion to Strike One Government Claim for Taxes (Docket No. 23, filed October 18, 2002);

(2) Receiver's Motion for Order Approving Payment of Professionals (Docket No. 24, filed October 18, 2002);

(3) Receiver's Motion for Order Approving Recoupment Notice to Beneficiaries of the Receivership Estate (Docket No. 25, filed October 18, 2002) (later withdrawn);

(4) Motion of Chapter 7 Bankruptcy Trustee for Order Authorizing and Approving Settlement Agreement with United States of America (Docket No. 51, filed January 15, 2003) (oral argument on April 2, 2003);

(5) Receiver's Motion to Allow Filing of Oversize Response Brief Regarding Taxes (Docket No. 52, filed January 22, 2003) (ALLOWED by marginal order on May 28, 2003);

(6) Motion of United States (1) To Strike [DI# 54] Receiver's Effort to Circumvent Failure to Comply with Court Orders and Deadlines by Purporting to "Notice" Other Parties' Motions and (2) To Enter Default–Dismissal of Receiver's Motion to Reform Mandelman Contract and Recover Levied Funds (Docket No. 58, filed February 11, 2003);

(7) Motion of United States to Preserve Certain Important Pre–Trial Rights if the Court Allows the Receiver's Reformation/Wrongful–Levy Motion to Go Forward (Docket No. 61, filed February 11, 2003);

(8) Receiver's Motion for Equitable Subordination of the United States' Claims Against the Receivership Estate and the Bankruptcy Cases (Docket No. 64, filed February 21, 2003);

(9) United States' Motion to Dismiss, for Lack of Jurisdiction and Other Reasons, the Requests for Equitable Subordination Included as Point 8 in [DI# 48] the Receiver's Opening Substantive Submission (Docket No. 69, filed February 21, 2003);

(10) Motion of Michael Mandelman (1) To Strike [DI# 54] Receiver's Effort to Circumvent Failure to Comply with Court Orders and Deadlines by Purporting to "Notice" Other Parties' Motions and (2) To Enter Default–Dismissal of Receiver's Motion to Reform Mandelman Contract and Recover Levied Funds (Docket No. 73, filed February 20, 2003);

(11) Motion of Michael Mandelman to Preserve Certain Important Pre–Trial Rights if the Court Allows the Receiver's Reformation/Wrongful–Levy Motion to Go Forward (Docket No. 75, filed February 20, 2003);

(12) Receiver's Motion (1) That IRS Fully Brief for the Court All the Tax Implications in the Receivership of the Proposed Bankruptcy Settlement; and (2) For Extension of Time to Respond to Proposed Bankruptcy Settlement Until After IRS Brief Is Filed (Docket No. 80, filed January 31, 2003);

(13) U.S. Motion (1) To Strike That Part of DI# 66 Which Seeks a Declaratory Judgment Regarding Sterling's Liability Under 31 U.S.C. § 3713, and (2) to Dismiss Remainder (Raising Issues of Transferee Liability) for Lack of Ripeness (Docket No. 86, filed March 7, 2003);

(14) Renewal of United States' Motion to Dismiss, for Lack of Jurisdiction and Other Reasons, the Receiver's Expanded and Reformulated "Motion" for Equitable Subordination [DI# 64], and (2) Supplement, Raising Lack of Ripeness (Docket No. 88, filed March 7, 2003);

(15) Receiver's Motion for Sanctions Against the Trustee and the Government and Preliminary Objection to the Settlement Between the Government and the Trustee (Docket No. 95, filed March 17, 2003);

(16) Receiver's Motion for Declaratory Relief and Preliminary Objection to IRS/Trustee Settlement Agreement (Docket No. 96, filed March 17, 2003);

(17) United States' Motion to Strike Mr. Tanner's Fabrication (in DI # 79) Designed to Manufacture Yet Another Allegation of "Misconduct" Against Government Counsel and Request that Court Admonish Mr. Tanner to Cease the Incivility (Docket No. 98, filed March 13, 2003);

(18) Motion by Stephen Rodolakis for Leave to File in Excess of Page Limit (Docket No. 109, filed March 28, 2003) (ALLOWED by marginal order of May 27, 2003);

(19) Motion by Sterling Consulting to Appear Telephonically at Hearing on May 1, 2003 (Docket No. 119, filed April 14, 2003) (withdrawn);

(20) Motion by Sterling Consulting for Order Requiring Recoupment from Certain Beneficiaries of the Receivership Estate (Docket No. 122, filed April 16, 2003); and

(21) Motion by Sterling Consulting to Separate Issues Regarding Mr. Mandelman's Alleged Fraud on the Receivership Court and Related Issues from Remainder of the Receivership Case (Docket No. 125, filed April 22, 2003).

At the Case Management Conference (CMC) on April 2, 2003, the Receiver withdrew its Notice to Court of Receiver's Previously–Filed Motion to Quiet Title Under 28 U.S.C. § 2410 and Request that Court Enter Default Ruling on Same (Docket No. 53, filed February 6, 2003). As a consequence, the Joint Preliminary Motion of the United States and the Trustee to Strike "Notice to Court of Receiver's Previously–Filed Motion to Quiet Title Under 28 U.S.C. § 2410 and Request that Court Enter Default Judgment" (and Joint Request to Address Merits if Court Denies Motion to Strike) (Docket No. 55, filed February 6, 2003) is moot.

## I. Factual Background

The following entities play a part in the history of this case:

- Indian Motorcycle Manufacturing, Inc. ("IMMI"), the company placed in receivership

- Sterling Consulting Corporation in its capacity as receiver of IMMI ("the Receiver")

- Indian Motocycle Company ("Company"), one of the three Massachusetts bankruptcy debtors

- Indian Motocycle Apparel and Accessories Company ("Apparel") and Indian Motocycle Manufacturing ("Manufacturing"), the other two of the three Massachusetts bankruptcy debtors

- The Chapter 7 trustee for the three Massachusetts bankruptcy debtors ("the Trustee")

- Indian Motor Company ("Motor"), a Nevada corporation
- American Indian Motorcycle Co. ("AIM")
- IMCOA Licensing America, Inc. ("IMCOA"), the purchaser of the assets of the bankruptcy and receivership estates in February 1999

Practice and Procedure Order No. 1 (Docket No. 2) recites a brief synopsis of the events leading up to this court's involvement in the case.

The following, more extensive, history was provided by the IRS. The parties appear to agree on the basic factual outlines of the case but have not stipulated because of conflicting interpretations and contentions about nuances. I make no rulings as to the disputed interpretations and nuances and provide this background recitation by the IRS for explanation, with the caution that I have not adopted it because of these conflicts.

### Early history in bankruptcy cases

The three bankruptcy debtors (Company, Manufacturing, and Apparel) were owned at one time by Phillip Zanghi. Company and Apparel were the subject of involuntary bankruptcy petitions in 1993 that were soon converted to voluntary cases. Manufacturing was in state court receivership in Connecticut. Michael Mandelman, through Indian Distributors Pty of Australia (Distributors), obtained an $886,000 judgment against Apparel, Manufacturing, and Zanghi (but not Company), sometimes referred to as the *Hayim–Langridge* judgment (Hayim–Langridge was apparently a one-time partner of Mandelman). Zanghi satisfied the judgment against him and received $15,000 in cash in exchange for assigning Distributors (Mandelman) the stock in the three companies. (The parties dispute whether Mandelman could still collect from the other two judgment debtors, Manufacturing and Apparel.)

Mandelman then filed a Chapter 11 case for Manufacturing. The Trustee for the Chapter 7 debtors (Company and Apparel) claimed that Zanghi had caused Company to fraudulently transfer all the trademark assets to Manufacturing before filing bankruptcy. Mandelman entered an agreement with the Trustee to buy off this claim by reorganizing Manufacturing and paying all of Company's debts up to $2.3 million. To secure the payment obligation, Mandelman gave the Trustee a pocket judgment on the fraudulent transfer claim, and a security interest in a contract by which another Mandelman company (Motor) was purchasing the stock in American Indian Motorcycle Co. of California (AIM), which asserted competing claims to the trademark assets. Motor, Manufacturing, and Mandelman were obligated to complete the AIM purchase and a default on that obligation was expressly a default on the obligations to the Trustee. The agreement gave the Trustee the right to take over the contract and complete it for the benefit of the bankruptcy estates. (The parties dispute whether the security interest was enforceable.)

In later summer, 1995, Mandelman and his companies defaulted and the Trustee soon thereafter asked the bankruptcy court to enter the fraudulent transfer judgment and enforce the security interest in the AIM stock purchase contract. The Trustee also sought authority to borrow money from MBL Investments on a secured/superpriority basis, to continue making installment payments on the AIM stock purchase contract.

### Receivership commencement and financing

Meanwhile, Sterling was appointed the receiver of IMMI in April, 1995 [by the Colorado District Court]. This occurred after the bankruptcy court entered a TRO against IMMI. That TRO was converted into a preliminary injunction. Judge Weinshienk [of the Colorado District Court] held that the bankruptcy injunction was void and stayed equitable actions against the receivership estate.

During the early operation of the receivership, the Receiver had anticipated assembling the fragmented and competing rights to the Indian trademark, and envisioned having IMMI (or a subsidiary) eventually manufacture motorcycles. In order to raise money to finance the acquisitions and expenses of the receivership, the receiver issued "Receiver's Certificates" to administrative investors. Each certificate promised to repay the bearer the state principal received, plus 6% interest. In addition, [some of the certificates] stated that IMMI would issue stock to the bearer, and contained anti-watering provisions assuring that the bearer's interest would ultimately represent no less than a stated percentage interest in the issued and outstanding stock of IMMI at the time the receivership was terminated. The principal plus 6% interest had priority over all other expenses except the administrative expenses of the receivership. Payment of the stock, on the other hand, was subordinated to all other claimants (except late-filed claims).

### Receivership/bankruptcy acquisition, early disputes, and marriage

[I]n October of 1995, [Mandelman] agreed to sell his stock in the three debtors and Motor to the Receiver, originally for $50,000 down, $800,000 promised, 10% of the stock in IMMI at termination of the receivership (subject to the same anti-watering provisions as certificate holders), and 50% of a corporation to hold the trademark rights in Europe. (The Receiver claims it was also assigned Mandelman's rights in the *Hayim–Langridge* judgment, whereas the government maintains that the judgment was no longer enforceable and also that it was never included in the transfer. The Receiver filed claims for the *Hayim–Langridge* judgment—over $900,000 with prepetition interest—against all three debtors.)

As the successor in interest to Motor's rights, the Receiver immediately disputed the validity of the security agreement in AIM stock purchase rights and objected to the Trustee's motion to borrow money to complete the purchase of the AIM stock. The bankruptcy court granted the Trustee authority to borrow from MBL with the lien on the AIM stock subject to any provable defects in the previous security agreement. The Receiver then claimed that MBL, which had previously been supplying funds for payments on the AIM stock[,] was embezzling funds from Motor for this purpose. Accordingly, the Receiver eventually claimed that it was subrogated to the superpriority claim and lien granted by the bankruptcy court to MBL. This became known as the "superpriority lien" claim. The Receiver also caused the Colorado District Court to order the sellers of the AIM stock to interplead the contract so that the claims of the Receiver versus the Trustee could be adjudicated in Colorado.

In the midst of these disputes, the Trustee attempted to sell the trademark assets of the bankruptcy estates to MBL for an amount sufficient to pay all claims subject to a $2.3 million cap. The Receiver objected, arguing that there might be $6 million in allowable bankruptcy claims, and proposed a joint sale

alternative under which joint proceeds would first pay all bankruptcy claims with the receivership estate entitled to the balance. The Trustee ultimately agreed and both courts approved the coordinated sale agreement..... The parties reported to the Colorado District Court that this mooted the dispute over which estate had the paramount claim to complete the AIM stock purchase contract, and the Trustee acquiesced in the Receiver's continued negotiation and litigation with the sellers of the AIM stock.

### Renegotiation of Mandelman consideration and United States intervention

The joint sale agreement made it clear that the Receiver was not going to reorganize IMMI into a motorcycle manufacturer and was instead going to sell all the trademark assets. But the agreement to grant Mandelman 50% of the European trademark rights was an encumbrance. Meanwhile, a former "girlfriend" of Mandelman's, Michele Lean, claimed an interest in Mandelman's rights under the October 1995 agreement with the Receiver and the Receiver agreed with her and proposed to pay her a substantial portion of the $800,000 in cash owed to Mandelman. The United States (and Mandelman) objected. The IRS had served a notice of levy on the Receiver for Mandelman's taxes, which the Receiver had previously stated it would comply with. But when the Receiver proposed paying part of the amount promised Mr. Mandelman instead to Ms. Lean, the United States moved to intervene, claiming a tax lien (for Mandelman's taxes) on the proposed payment to Lean. The motion was granted.

Ultimately, Mandelman, Lean, and the Receiver reached a settlement (court-approved) under which Mandelman would no longer receiver 50% of a company controlling the European rights (thus enabling an unencumbered sale of the trademark assets), or 10% of IMMI. Instead, they would receive an undiluted 5.5% of IMMI or the company acquiring the trademark rights (3% for Mandelman and 2.5% for Lean), and the $800,000 payment would be raised to $2,330,000, with $330,000 of that sum payable to Lean. Since $2 million was more than enough to satisfy Mandelman's taxes, this could moot the United States' objection to the payment to Lean. But the United States did not drop its objections yet since there was no assurance that sale would generate sufficient proceeds to pay the promised amounts. The IRS served a new levy on the Receiver (since the old one may have reached only the $800,000 previously owed to Mandelman). When the assets sale was approved (see below), the United States and Receiver filed a stipulation in January 1999, agreeing that the Receiver would honor the new IRS levy by paying the IRS the portion of Mandelman's $2 million needed to satisfy his taxes, and the United States withdrew its objections to the proposed simultaneous payment to Lean.

### New and revived inter-estate disputes and partial settlement

Eventually, the Receiver began to worry that the Trustee was failing to prosecute objections to claims, the allowance of which would damage the receivership estate under the deal that all bankruptcy claims were to be paid first from the future joint sale proceeds. The Receiver ultimately argued that the Trustee's claims estimate at the time of the original joint sale agreement was intended to cap the amount allocable to the bankruptcy estates. A provision to that effect was put in a proposed sale contract to a third party (Eller Industries) and the Trustee objected. The

dispute carried over into the proposed sale contract with IMCOA. The bankruptcy court indicated that any sale with a cap on the amount allocable to the bankruptcy estate would be "dead on arrival." This dispute was settled by agreement to cap the amount allocated to the bankruptcy estates at $3.5 million. The agreement gave the bankruptcy court jurisdiction to determine any allocation under the cap, including a new dispute over whether the priority payment of "all" bankruptcy claims was intended to include postpetition interest on prepetition claims (which normally get interest only after satisfaction of all prepetition claims without postpetition interest but before shareholders receive any distribution), and another new dispute over whether claims against Manufacturing and Apparel could be paid, given that only Company had contributed assets to the joint sale.

The Trustee represented to the bankruptcy court that he was willing to accept such a cap because he was sure that $3.5 million would be sufficient to pay all valid claims (including postpetition interest if he won that dispute). The bankruptcy court approved this agreement on January 13, 2002, in an opinion highly critical of the Receiver, making it clear that it saw no such cap in the original joint sale agreement that the court had approved, and characterizing the effort to insert the cap as a disingenuous effort to modify a valid court order without seeking relief under Rule 60(b). The bankruptcy court said it was nevertheless approving of the cap because of the Trustee's "business judgment" that there was no risk that any valid claim would go unpaid. The $3.5 million was to be escrowed in a two-signature (Receiver/Trustee) account.

### February 1999 joint assets sale

The sale closed in February, 1999. IMCOA purchased, inter alia, all of the assets of the bankruptcy estates and the receivership estate (which consisted chiefly of the rights to the trademark), in exchange for a cash payment of approximately $17 million and 2.25 million shares of IMCOA stock, sometimes referred to as the "purchase money stock." The purchase agreement provided that the cash portion of the purchase price was subject to upwards or downwards adjustment to cover claims against the bankruptcy and receiver estates, subject to a cap, plus amounts to cover ongoing receivership expenses subject to a monthly cap. Thus, unless the total bankruptcy and receivership claims exceeded the sale agreement's cash payment cap, the 2.25 million shares of IMCOA stock would be distributable to the would-be shareholders of IMMI on termination of the receivership. (As noted, the Trustee's share of the joint sale proceeds was limited to the lesser of $3.5 million or the total of allowed bankruptcy claims, and the $3.5 million was escrowed.)

In this regard, since IMMI would no longer be a going concern (and would certainly not be manufacturing motorcycles), the Receiver proposed that, upon termination of the receivership, all persons to whom the receiver had promised IMMI stock or rights thereto would receive IMCOA stock in lieu of, and in proportion to, the IMMI stock that they had been promised. This included the Receiver's certificate holders, Mandelman/Lean, and also members of the Receiver's Finance Committee whom the Receiver proposed (and obtained court approval) to compensate with varying percentages of the purchase money stock.

### Final (supposedly) inter-estate settlement

Still unresolved after the January 1999 agreement were the disputes over (1) interest on prepetition claims, (2) whether claims against all three debtors or only Company were payable, (3) the superpriority lien claim, and (4) whether that claim and the *Hayim–Langridge* judgment claim had to be subordinated.... [T]he superpriority lien claim came to include, according to the Receiver, not only the amount that the Trustee had borrowed from MBL with bankruptcy court approval (approximately $386,000), but also all prior amounts that had been paid previously towards the AIM stock purchase when Motor (or predecessor companies controlled by Mandelman) held the AIM stock purchase rights and were obligated to make the payments (over $1.1 million). The Trustee was arguing that the Receiver's claims should be subordinated or else the spirit of the agreement by which all bankruptcy creditors would be paid first and in full before receivership creditors would be frustrated. That was because the total claims asserted by the Receiver—over $2 million combined—would put the total bankruptcy claims above the $3.5 million cap.

In July, 1999, during a mediation conference brokered by Magistrate Judge Schlatter, the Receiver and Trustee reached what was supposed to be a final settlement of their lingering disputes. Judge Schlatter approved it at the conference and it was approved by the Bankruptcy Court on September 21, 1999. It included (1) releasing the two-signature escrow and agreeing that all $3.5 million would flow to the bankruptcy estates; (2) compromising the superpriority lien claim at $550,000 and paying immediately, (3) subordinating the *Hayim–Langridge* judgment claim, (4) allowing payment of claims against all three debtors, and (5) not including postpetition interest on prepetition claims. (The Receiver also gave up a claim, meritless in the view of the United States, that the Trustee had committed improprieties for which he should be held personally liable to the Receiver.) In seeking approval for the settlement, the Trustee again represented that all bankruptcy claims other than the Receiver's subordinated claim would be paid in full.

### Aftermath

The Receiver distributed the cash it received from the joint sale to IMMI's creditors in September and October, 1999. At that time, the Receiver repaid the certificate holders their principal loan amounts, plus 6% interest, and also made the cash payments to Lean and Mandelman (with most of Mandelman's amount going to the IRS, as stipulated). The Receiver also paid all accrued administrative expenses not previously paid. It did not create any cash reserve for any possible income tax liability resulting from the sale. All that was left in the receivership estate was the purchase money stock (some of which was thereafter sold to pay further administrative expense claims in excess of the amounts IMCOA paid to the Receiver to cover post-sale administrative expenses). The Receiver dissolved IMMI and Motor in November of 1999.

Docket No. 49, Ex. 1 at 2–7.

## II. Proposed Settlement Between the Bankruptcy Trustee and the United States

### A. Disputes Compromised by the Proposed Settlement

The IRS, upon reviewing the Chapter 7 Trustee's 1999 tax returns, determined that the Trustee owed $3,660,384 in taxes, a $124,527 accuracy-related penalty, a

$188,772 failure-to-pay-estimated-tax penalty, interest on the penalties, and late-payment penalties.

The IRS and the Trustee disagree on the following issues:

### 1. Inter–Estate Reallocation of Income

Company reported approximately $3.5 million in proceeds from the Joint Sale. The IRS, pursuant to 25 U.S.C. § 482, which allows the IRS to reallocate income between related entities to prevent tax evasion, sought to reallocate $8.8 million from IMMI to Company. The IRS maintains that the reallocation more accurately reflects the value of the respective contributions. The difference between the higher figure and the $3.5 million should, the IRS contends, be treated as a constructive dividend by Company in favor of the Receiver.

### 2. Reallocation Between Bankruptcy Debtors

The IRS also disagreed with the Trustee's allocation of sale proceeds among the bankruptcy debtors. The Trustee had allocated $145,244 of the $3.5 million to Manufacturing. The IRS reallocated the $145,244 to Company, because Company held all trademark assets sold and Manufacturing held none. The $145,244 should therefore be treated as a non-deductible transfer, according to the IRS.

### 3. Capital Loss Carryover on Loss of AIM Stock

The Trustee claimed a $1,519,206 capital loss carryover, based on a claimed worthless security loss related to the purchase of AIM stock. The $1,519,206 represents all amounts paid in connection with the AIM stock purchase, including the $550,000 superpriority lien paid to the Receiver. The IRS contends that the Receiver was not entitled to payment on the superpriority lien, because by the time the Trustee paid the lien the Receiver had already been repaid in AIM stock. The $550,000 should therefore be treated as a constructive dividend. As to the remainder of the sum claimed, the IRS states that the Trustee never paid any of it for the AIM stock purchase.

The Trustee's position is that the $550,000 superpriority lien claim was allowed by a court-approved settlement, which is binding on the IRS.

### 4. Hayim–Langridge Judgment Deduction

The Trustee claimed a deduction of $144,951, for one-third of the $435,000 that he expected to pay to the Receiver for the subordinated judgment claim. The IRS disallowed this deduction, because the judgment was never against Company, the judgment was never assigned to the Receiver, and the judgment had already been satisfied. Moreover, the Trustee never paid the judgment and, in light of the United States' administrative tax claims, lacks the funds to do so now.

### 5. Escrow Funds

The Trustee claimed a deduction of $627,650 that it anticipated distributing to creditors with tax-deductible claims. The IRS disallowed this because the funds were never paid. In addition to tax increases related to these disputes, the IRS also imposed penalties on the Trustee.

### B. The Terms of the Proposed Settlement

■ The IRS and the Trustee now ask this court to approve a proposed settlement, under which, in full satisfaction of Company's tax, penalty, and interest, the IRS would accept from the Trustee

$600,000; all interest earned on the $1.2 million after June 7, 2001; and an assignment of the Trustee's right to recovery of approximately $102,000 in interest earned on the $1.2 million while held in escrow by the Receiver from December 30, 1999, to June 7, 2001. The IRS has agreed to assert no tax liability for 1999 against Apparel and Company.

The Proposed Settlement specifically states that "[t]he United States may argue that the approval of this settlement precludes the Receiver from alleging that it has a right to reallocate income from IMMI to Company for the purpose of reducing IMMI's liability." Docket No. 51, Ex. A at 20.

The Proposed Settlement also provides for several contingencies:

If the order approving the Proposed Settlement is appealed, the Trustee will wait to distribute the bankruptcy estates' funds until the order becomes final and all appeals are exhausted. If the order is reversed on appeal, the Proposed Settlement would be deemed void *ab initio*.

If the Receiver recovers any portion of the $1.2 million in any proceeding or court, the Trustee may declare the Proposed Settlement void *ab initio*.

The Proposed Settlement also provides that the United States and the Trustee will equally share any award of attorney fees, and that the Trustee will assign to the United States its potential chose in action to recover the interest earned on the $1.2 million. If the parties' waiving either of these provisions will encourage the Receiver not to appeal an order approving this Proposed Settlement, however, the parties will waive these provisions.

## C. Legal Standard

In determining whether a proposed settlement is a balanced, appropriate, and acceptable agreement for compromise, a court looks to factors including—

(i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexities of the litigation involved, and the expense, inconvenience, and delay attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable views . . . .

*Jeffrey v. Desmond,* 70 F.3d 183, 185 (1st Cir.1995).

The Trustee asserts that the Settlement Agreement satisfies all these considerations. In its Motion for Order Authorizing and Approving Settlement Agreement with the United States of America, the Trustee states:

a) The disputes with the United States will prove costly and time consuming to litigate to a conclusion and will further delay distributions to creditors of the bankruptcy estates. In addition to the costs to date, litigation on the merits in all likelihood will require the involvement of tax counsel as well as expert testimony with respect to the valuation of the Debtors' and the Receiver's respective interests in the trademark rights. Moreover, one or more appeals likely will follow.

b) The proposed compromise is well within the range of likely outcomes, particularly when compared to the costs of further litigation on the merits. The $600,000 payment represents a substantial discount from the United States' asserted claims ranging from $660,000 to some $4 million.

c) In addition to stemming the costs of further litigation with the United States, the compromise will ensure that funds remain in the bankruptcy estates to cover competing adminis-

trative expense claims, including the Trustee's fees and those of his professionals, as well as to permit further distributions to unsecured creditors of the bankruptcy estates. Were the United States to succeed in establishing an administrative claim of $1 million or more, little or no funds would be available to satisfy other claims.

d) Compromise of the disputes with the United States will resolve one of the last remaining issues in this nearly decade[-]old case and will expedite and enhance payments to other creditors of the bankruptcy estates.

e) In addition to directly enhancing the interests of creditors of the Debtors' estates, the compromise indirectly will advance the termination of the receivership case by enabling the Court to determine IMMI's taxes with no further interrelationship with Company's taxes. The settlement resolves the issue of allocation of the sales proceeds between the Debtors' estates and the receivership estate without the need for further litigation on that issue, by waiving the IRS's claim to reallocate and thus leaving the allocation of sale proceeds for tax purposes the same as the Trustee and Receiver agreed for distribution purposes.

Docket No. 51 at 15–16.

The court may give substantial deference to the business judgment of a bankruptcy trustee when deciding whether to approve a settlement. *In re Indian Motocycle, Inc.*, 289 B.R. 269, 283 (1st Cir. BAP 2003) ("Compromises are generally approved if they meet the business judgment of the trustee."). In light of the Trustee's submission, the Proposed Settlement appears acceptable to the court.

The Receiver has, however, raised objections that the court will consider.

## D. The Receiver's Objections to the Settlement

Although the Receiver has announced an intention to object to the proposed settlement, it has so far voiced only "preliminary objections" by motion and in brief remarks at the CMC of April 3, 2003. *See* Docket Nos. 95, 96. The Receiver has also asked that the IRS brief all possible tax repercussions of the settlement. Docket No. 80. The court denied that request at the CMC of April 3, 2003, stating that "I will not order the government to file any brief on that subject because that would only be a recipe for monumental delay." Docket No. 123 at 37–38. The Receiver has not filed any further objections since that conference. The court will, therefore, consider the Receiver to have stated all of the arguments it intends to advance.

The Receiver has objected to the recharacterization of the $550,000 superpriority lien payment as a constructive dividend to IMMI, based on its concern that "the tax treatment of a dividend is completely different than the tax treatment of a repayment of a loan pursuant to a super-priority lien." Docket No. 102 at 3. The IRS responded, in oral argument, that "between corporations, a dividend is not taxable as income. There's a dividend-excluded provision. So that IMMI getting a dividend from the bankruptcy estate does not tax IMMI at all. There's no tax on IMMI as a result of this settlement." Docket No. 123 at 41. The court will consider the IRS to be bound by its oral representation on this point. *See In re Indian Motocycle*, 289 B.R. 269, 278 (1st Cir. BAP 2003) (holding that parties are bound by positions that they take in their briefs and at oral argument).

The Receiver has also objected that the settlement can be effectuated only if the

$450,000 belongs in the bankruptcy estate rather than the receivership. The Receiver has in the past asserted a claim to this $450,000. In its original Motion to Quiet Title, the Receiver premised its claim for the $450,000 on alternative theories: first, the $450,000 was due to it as the value of the Zanghi Judgment, and second, the $450,000 was the amount left over from the $3.5 million received by the Trustee pursuant to the coordinated sale. Docket No. 53, Attached Proposed Order Quieting Title at 4. (Notably, in that motion the Receiver stated that the dispute over the $450,000 "will not preclude the settlement between the Trustee and the IRS now pending." Docket No. 53 at 5.) The Receiver withdrew its Motion to Quiet Title as moot in light of this court's ruling in the related Consolidated Bankruptcy Appeals. Docket No. 124; see In re Indian Motocycle Manufacturing Company, Inc., 288 B.R. 617 (D.Mass.2003). At the CMC of April 3, 2003, however, the Receiver still appeared to maintain that the $450,000 may belong in the receivership.

Having withdrawn the Motion to Quiet Title, the Receiver now attempts to dispute the ownership of the $450,000 by calling into doubt the continued validity of the 1999 Settlement Agreement. The Receiver's argument, briefly summarized, is as follows: In 2001, the Massachusetts Bankruptcy Appellate Panel held invalid the portion of the 1999 Settlement Agreement that would move adjudication of the bankruptcy estate's tax liabilities to the receivership court. In re Indian Motocycle Co., 261 B.R. 800, 810 (1st Cir. BAP 2001) ("BAP I"). The Receiver argues that this holding renders the entire 1999 Settlement Agreement void ab initio, as the Agreement contained a Limited Severability clause stating that "if any provision of this Settlement Agreement is held to be prohibited by or invalid under any applicable law by the District Court of the Massa-chusetts Bankruptcy Court, the Settlement Agreement shall be deemed to be void ab initio." Docket No. 97, Ex. 2 at 7. The court understands the Receiver to argue that because the 1999 Settlement Agreement released the $3.5 million (of which the disputed $450,000 is one part) to the Bankruptcy Estate in the first place, the invalidity of that agreement now reopens the question of who is entitled to the $450,000.

The Receiver made precisely the same argument in its Petition for Rehearing, following this court's decision in the related Appellate Proceedings. See Docket No. 30 at 4–5, in No. 01–40180–REK. This court summarily rejected that argument in its Memorandum and Order of March 20, 2003. Docket No. 33 at 5, in No. 01–40180–REK.

The Receiver elsewhere advances a somewhat different argument: because the 1999 Settlement Agreement approved the Receiver's Judgment Claim and also subordinated it, if the 1999 Settlement Agreement is void, then the Judgment Claim should be considered a super-priority lien and should be paid to the Receiver now. Docket No. 102 at 3 n. 1.

This objection does not persuade me that I should not provisionally approve the settlement. The Receiver has conceded that the previously advanced argument to this effect is now moot. The Receiver's remaining arguments, based on the alleged voiding of the 1999 Settlement Agreement, are likewise unconvincing. Even if voiding the Agreement would entitle the Receiver to $450,000, the Receiver's arguments regarding invalidity are barred by res judicata. The Receiver states that the 1999 Settlement Agreement is void dating from the entry of BAP I, in March 2001. Yet the Receiver did not raise its void ab initio argument to the Bankruptcy Court before

that court issued its Order of August 2, 2001. *See In re Indian Motocycle Co., Inc.,* 266 B.R. 243 (Bankr.D.Mass.2001). Having failed to raise the argument earlier, when it had the opportunity, the Receiver is barred from doing so now. *See Stephenson v. Dow Chem. Co.,* 273 F.3d 249, 259 (2d Cir.2001) (parties cannot relitigate issues that were or could have been raised in a previous action that ended in a final judgment on the merits). For this reason, I also deny the Receiver's request for a declaration that the Receiver can void the 1999 Settlement Agreement (Docket No. 96 at 20).

## E. Approval

I approve this settlement provisionally. My approval cannot be final at this time, however, because the proposed settlement contains two conditions subsequent. First, the agreement will be declared void *ab initio* if the order approving it is reversed on appeal. Docket No. 51, Ex. A at 18. Second, the agreement may be declared void *ab initio*, at the Trustee's election, if the Receiver recovers, in any proceeding or court, any portion of the $1.2 million or interest. *Id.* Until future events determine whether these conditions are met, my approval of the settlement cannot be final. This provisional approval is meant to encourage the parties to continue to work toward a final settlement in this case.

## III. Receiver's Motion to Strike One Government Claim for Taxes

■ The assets of the bankruptcy and receivership estates were sold together in the Joint Sale of February 1999 for combined proceeds of $18,978,266. By the terms of the 1999 Settlement Agreement, the Bankruptcy Estate's portion of the sale was limited to $3.5 million; the remainder of the proceeds went to IMMI. Pursuant to 26 U.S.C. § 482, the IRS reallocated $8.8 million from IMMI to Company, based on its determination that $12,335,873 of the proceeds were attributable to assets contributed by Company. Docket No. 31 at 4. Notwithstanding its determination that the funds belong to Company, the IRS has filed claims for federal taxes on the same $8.8 million in both the Receivership Estate and the Bankruptcy Estate. Docket No. 23 at 1.

The Receiver's position is that the inconsistent assessments are equivalent to pleadings in the alternative and thus are subject to Federal Rule of Civil Procedure 8(e). Because discovery, in the form of "exhaustive audits of both estates," is now complete, the Receiver says the IRS has no basis for continuing to plead in the alternative. *Id.* "It is impossible ... for the IRS to believe, in good faith," that the $9 million in question is income both to the Receivership Estate and the Bankruptcy Estate.

The IRS, on the other hand, explains that the inconsistent assessments protect the government from a "whipsaw":

> A whipsaw would occur if the IRS was forced to treat both sides of a transaction consistently where the facts or application of law to those facts are in dispute, and assess only one of two taxpayers based on one view of the facts or law, and allow the statute of limitations on assessment against the other taxpayer [to] expire before the IRS can change its position to conform to a judicial ruling against it on its initial position. To prevent such a whipsaw, assessments are made against both taxpayers on inconsistent theories to protect the statute of limitations until the matter is resolved by the courts.

Docket No. 31 at 3. The IRS's stated concern is this: "The current motion of the Receiver seeks to have the Court force the IRS to reduce the income of the receivership entity, IMMI, before it prevails on the reallocation to the bankrupt corporation, Company. Then, if the IRS loses the real-

location issue in the bankruptcy case, it will be too late for the government to claim tax from IMMI." *Id.* at 6.

Numerous courts have permitted such whipsaw assessments. *See, e.g., Sherbo v. C.I.R.,* 255 F.3d 650, 655 (8th Cir.2001); *Fayeghi v. C.I.R.,* 211 F.3d 504, 508 (9th Cir.2000). In any case, the Anti–Injunction Act provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). The Tenth Circuit held that the Anti–Injunction Act applied in the Receivership case and prevented the district court from enjoining the IRS from determining tax liabilities if it failed to act before a court-imposed deadline. *Sterling Consulting Corp. v. United States,* 245 F.3d 1161, 1167 (10th Cir.2001). Similarly, the Anti–Injunction Act here prohibits the Receiver from seeking to restrain either of the IRS's inconsistent assessments.

The court therefore denies the Receiver's motion to strike one assessment.

This dispute, however, has been resolved provisionally against the IRS in another manner. In the Settlement approved by the court in this Order, the IRS waives its arguments regarding the inter-estate reallocation of income for tax purposes, leaving all of the assets from the sale with IMMI, as the parties originally decided. Docket No. 51 at 16. The approval of the settlement is, of course, subject to certain conditions subsequent. Barring the occurrence of those conditions, however, the IRS's tax claim against the Bankruptcy Estate has been dropped.

## IV. Tax Liability of the Receivership

### A. Introduction

#### 1. Procedural Background

The IRS and the Receiver disagree about the Receivership's tax liability for fiscal year 1999. The IRS has disallowed four deductions, discussed in detail below, increasing the Receiver's taxable income.

At the CMC of November 15, 2002, the court stated its intention to make an interlocutory ruling on the tax issues. The United States now "advises the Court that there is no material issue of fact with respect to the four tax deductions [in question, and therefore] the Court should be able to determine the validity of those deductions as a matter of law." Docket No. 71 at 2.

Because the information used by the IRS was furnished by the Receiver and thus constitutes admissions, and because the Receiver has failed to identify any material issues of fact in respect to the four tax deductions at issue, the United States submits that it is entitled to judgment as a matter of law with respect to the four issues as demonstrated below.

*Id.* at 3.

The Receiver also considers the matter ripe for decision. *See* Docket No. 82 at 10 ("The Court now has enough evidence before it that it can enter its preliminary ruling that all the receivers [sic] claimed expenses are proper and that no taxes are due."). The court thus proceeds to the substantive tax issues.

#### 2. Legal Standard

█ Federal tax assessments are presumptively valid. *U.S. v. Green,* 201 F.3d 251, 253 (3d Cir.2000).

It is well settled that the IRS's tax assessments are presumed to be correct and it is the taxpayer who must rebut this presumption. Only in rare cases can this presumption ... be overcome by destroying the assessment's foundation.

Generally a court will not look behind an assessment "to evaluate the procedure and evidence used in making the assessment." As long as the procedures and evidence upon which the government relies to determine the assessment have a rational foundation, "the inquiry focuses on the merits of the tax liability, not on the IRS procedures."

*Curley v. United States*, 791 F.Supp. 52, 54 (E.D.N.Y.1992) (citations omitted).

■ Once the taxpayer makes a threshold showing, however, the burden of proof shifts to the IRS:

(1) **General rule.**—If, in any court proceedings, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue.

(2) **Limitations.**—Paragraph (1) shall apply with respect to an issue only if—

(A) the taxpayer has complied with the requirements under this title to substantiate any item; [and]

(B) the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews

. . . .

26 U.S.C. § 7491(a). The Court of Appeals for the First Circuit has explained the interaction of the initial presumption of validity and the burden-shifting statutory provisions:

The burden of proof is generally on the taxpayer to demonstrate that the IRS's nondeductibility determination is in error. Once "a taxpayer introduces credible evidence with respect to any factual issue," the burden shifts to the IRS on that issue.

*Interex v. C.I.R.*, 321 F.3d 55, 58 (1st Cir.2003). "Credible evidence," for the purposes of the statute, consists of "evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." *Griffin v. C.I.R.*, 315 F.3d 1017, 1021 (8th Cir.2003).

In this case, the Receiver maintains that Paragraph (1) applies because the Receiver has "turned over to the IRS every single document that could possibly reflect on the issue of taxes." Docket No. 65 at 9. The IRS, on the other hand, maintains that Paragraph (1) does not apply because the Receiver has not complied with all of the IRS's requests for "witnesses, information, documents, meetings, and interviews." Docket No. 49 at 5. Even if the Receiver were entitled to the benefit of Paragraph (1), the IRS continues, the Receiver has failed to introduce credible evidence required to shift the burden to the IRS.

Based on the record before this court, I cannot determine whether or not the Receiver has in fact fully complied with the IRS's requests for information. Assuming without deciding, however, that Paragraph (1) is applicable, I find that the Receiver has not produced to this court the credible evidence with respect to any factual issue that would shift the burden of proof to the IRS.

**B. Deduction for Motor Claims Expense**

**1. Factual Background**

In 1995, the Receiver purchased Motor, along with the three bankruptcy debtor corporations, from Mandelman. Following the sale, the Receiver paid $4,129,252 to Motor's creditors ("the Motor Claims Ex-

pense"). The Receiver dissolved both IMMI and Motor in 1999.

## 2. Parties' Arguments

The Receiver claimed a deduction of the $4,129,252 for the Motor Claims Expense. The Receiver contends that the entire Motor Claims Expense was deductible under any one of three theories: as a business expense under 26 U.S.C. § 162; as an uncompensated loss under § 165(a); or as a worthless debt (because Motor was insolvent by the end of the 1998 tax year and thus could not repay the debt) under § 166(a). Docket No. 65 at 3–4.

Originally, the IRS reduced the deduction by $3,579,252 (Docket No. 48 at 4), treating the payment by IMMI, as a Motor shareholder, as a contribution to capital or an additional investment, not a business expense of the shareholder. Docket No. 49, Ex. 1 at 10. The IRS has since decided to reduce its original adjustment by $1,530,000 (resulting in an adjustment of $2,049,252), on the ground that the payment of claims against Indian Motor Company of Nevada was "a direct cost to IMMI of selling the trademark assets," paid to Mandelman to enable the Receiver to sell all trademark rights to a single purchaser. Docket No. 106 at 3. The IRS explains this reduction as follows:

> The reason the IRS is now reducing the adjustment by $1,530,000 (limiting the increase to taxable income to $2,049,252) is as follows. The $4,129,252 Motor Claims Expense figure includes the combined $2,330,000 in cash payments to Michael Mandelman and Michele Lean. Under the original (October 9, 1995) contract between the Receiver and Mandelman, the Receiver was required to give Mandelman 10% of IMMI's stock, 50% of a new company to control the *Indian* trademark throughout Europe, and an $800,000

note from the acquired corporations, including Motor. The $800,000 was thus considered a debt of Motor, rather than IMMI. In early 1997, the Receiver and Michele Lean entered a "settlement agreement" under which $330,000 of the $800,000 would be distributed to her instead of Mandelman, based on the Receiver's insistence that, upon Mr. Block's investigation, Ms. Lean had a substantial ownership interest in the assets that Mandelman had sold to the Receiver. At the November 24, 1997 hearing, with the Receiver's overall plan having changed from one under which IMMI would build motorcycles to one under which all of the trademark assets would be sold, Mandelman gave up the right to 50% of a to-be-formed company in control of the trademark in Europe. In exchange, the cash payment to Mandelman was increased to $2 million, which could "not be further reduced by virtue of the Michelle Lean receiver settlement," under which Ms. Lean would still receive $330,000 of the original $800,000. At the same time, instead of Mandelman receiving 10% of IMMI, which would now be dissolved, Mandelman and Lean would receive 3% and 2.5% respectively of the corporation that would, as a result of the assets sale, end up with the domestic trademark rights (referred to as the "U.S. Corporation"). The transcript further specifies that Mandelman's $2 million would [be] paid "in a cash payment at the final closing on the sale of Indian to its purchaser."

Under these facts, it is clear that Mandelman's payment was increased from $470,000 (of the $800,000 original debt from Motor) to $2 million and what he gave in exchange was a right to 50% of the trademark rights throughout Europe—a term that was disabling the Receiver from being able to sell all of the

trademark rights to a single purchaser. The increase—$1,530,000 [-] is thus a cost of the sale to IMMI.

*Id.* at 3–5 (citations and footnotes omitted). Notwithstanding this partial abatement, a dispute remains over the claimed deduction.

### 3. What Constitutes an "Ordinary and Necessary Expense"

 Section 162 of the Internal Revenue Code states that "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business" are deductible. 26 U.S.C. § 162(a). Reasonable " 'expenditures made to protect or to promote a taxpayer's business, and which do not result in the acquisition of a capital asset, are deductible' as ordinary and necessary expenses of transacting business." *Ray Crowder v. C.I.R.*, 19 T.C. 329, 334, 1952 WL 85 (1952). Only expenses that are "an integral part of a business" qualify as ordinary and necessary expenses. *Allen v. C.I.R.*, 283 F.2d 785, 790 (7th Cir.1960).

 In general, expenditures made on behalf of another's business are not ordinary and necessary expenses of the taxpayer's business. *Deputy v. duPont*, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940). "Payments made by a stockholder of a corporation for the purpose of protecting his interest therein must be regarded as additional cost of his stock and such sums may not be deducted as ordinary and necessary expenses." *Eskimo Pie Corp. v. C.I.R.*, 4 T.C. 669, 676, 1945 WL 220 (1945). When one corporation acquires another, the payment of the previous owner's obligations is considered a capital expenditure and not an ordinary and necessary business expense. *Ill. Tool Works, Inc. and Subsidiaries v. C.I.R.*, 117 T.C. 39, 46, 2001 WL 863544 (2001). Only in certain, limited instances are advances to another corporation deductible. For instance, a taxpayer's payments to another corporation in the process of dissolution have been held to be the taxpayer's business expenses, and not an investment in the other corporation, where the payments were necessary to protect the reputation and credit standing of the taxpayer's own business. *Allen v. C.I.R.*, 283 F.2d 785, 790–91 (7th Cir.1960).

### 4. The Court Order Does Not Make the Motor Claims Expense an Ordinary and Necessary Business Expense

 The Receiver argues simply that because the Colorado District Court ordered IMMI to pay Motor's debts, the payments are ordinary and necessary business expenses. Docket No. 65 at 3. This argument is unpersuasive. The fact that a court has ordered payments does not automatically render the payments tax deductible. "Mere obligation to pay, whether by court order or contracts, does not obviate the need to measure the expenditures against the requirements of section 162 of the Internal Revenue Code." *Dolese v. U.S.*, 605 F.2d 1146, 1151 (10th Cir.1979).

The Receiver has not introduced credible evidence that would remove the Motor Claims Expenses from the ordinary rule that a taxpayer's payments on behalf of another are not the taxpayer's own ordinary and necessary business expenses. In *Allen v. C.I.R.*, for example, the taxpayer demonstrated that an exception to the rule was warranted because the payment was necessary to protect the reputation and credit standing of the taxpayer's own business. *Allen*, 283 F.2d at 790. The Receiver has adduced no comparable evidence that the Motor Claims Expense was an integral part of IMMI's business.

### 5. The Receiver's Payments to Motor's Creditors Cannot Now Be Categorized as a Loss or a Bad Debt

The Receiver offers two alternative theories under which the deduction should be allowed: as a loss under § 165(a) or as a bad debt under § 166(a). Docket No. 65 at 3–4. Neither of these alternative theories is persuasive. Section 165 enumerates several categories of losses; the Receiver neither specifies which subsection describes the Motor Claims Expense nor explains how the expense constitutes a loss.

■ Nor has the Receiver produced any evidence that the payment was a loan to Motor that can now be deducted under § 166(a). The Receiver cannot retroactively recharacterize a transaction as a loan when the payment was not treated as a loan at the time. *See Nestle Holdings, Inc. v. C.I.R.*, 152 F.3d 83, 87 (2d Cir.1998) (holding that "a taxpayer is free to organize his affairs as he chooses, [but] once having done so, . . . he must accept the tax consequences of his choice, whether contemplated or not").

## C. Deduction for Receiver's Certificate Holders Stock Expense

### 1. Factual Background

In 1995, 1997, and 1999, the Receiver issued several series of "Receiver's Certificates" to investors in order to raise money to finance acquisition of the Indian trademark and pay the Receivership's expenses. The IRS has provided this court with examples of series A, B, D, and G certificates, explaining that it requested examples of series C, E, and F certificates, but Receiver's counsel did not have them and "represented that they were, in material respects, the same as one or another of the series A, B, and D that he had transmitted." Docket No. 71 at 6.

All of the Receiver's Certificates obligate the Receiver to pay the stated principal received plus six percent interest. Some of the certificates, exemplified in this court's records by the Series D Receiver's Certificate issued in 1997, also state that the holder will be issued IMMI stock.

When the certificates were issued, the Receiver envisioned that IMMI would eventually manufacture motorcycles. In 1999, in the Joint Sale, IMCOA purchased all the assets of the receivership and bankruptcy estates in exchange for $17 million in cash and 2.25 million shares of IMCOA stock. IMMI having been liquidated, the Receiver obtained authority to issue the IMCOA stock to the Receiver's Certificate holders in place of IMMI stock. Docket No. 49, Ex. 1 at 8. The Receiver has not, however, actually distributed the IMCOA stock. (The fact that stock was not actually distributed has no bearing on deductibility; 26 U.S.C. § 318(a)(4) provides that an owner of an option is treated, for tax purposes, as a stock owner.)

### 2. Parties' Arguments

The Receiver claimed a deduction of $1,321,428 for distribution of the IMCOA stock to Receiver's Certificate holders. Docket No. 48 at 3. The Receiver claims the deduction under I.R.C. § 163(a), which allows as a deduction "all interest paid or accrued within the taxable year on indebtedness." The Receiver states that the IMCOA stock is fairly characterized as "interest" because "[i]n order to obtain funding for IMMI, it was necessary to offer the creditors greater than 6% interest. The stock of IMCOA was offered as additional interest for the use of the Receiver's Certificate holders' funds." Docket No. 65 at 5. The interest was deductible in 1999, the Receiver contends, when IMMI's receipt of IMCOA stock enabled it to pay certificate

holders, even though the Receiver did not distribute the stock. (As an accrual-basis taxpayer, IMMI may deduct expenses in the year that the obligation to pay becomes fixed and determinable. *See Koehring v. U.S.*, 190 Ct.Cl. 898, 421 F.2d 715, 718 (1970).)

The IRS rejected that deduction in its entirety, reasoning that "both the form and substance of the transaction [reflect] a distribution of assets to equitable owners [of IMMI], in the nature of shareholders, on final liquidation." Docket No. 49 at 8. The IMCOA shares, as the only remaining asset of IMMI, were to be distributed to IMMI's owners. Furthermore, the IRS notes, even were the distribution deductible, it could not be deducted for 1999: The distribution not having taken place, the amount of the distribution is not yet fixed and determinable.

The Receiver argues, in response, that the distribution did not represent a right to stock because only Receiver's Certificate holders were to have received the distribution. Had the distribution represented a right to stock, "all stockholders would have received it. In fact, more than 98% of the stockholders in IMMI got nothing of this distribution." Docket No. 82 at 8.

In an alternative argument, the Receiver submits that the stock is "probably worthless." Were the Receiver allowed to adjust its 1999 returns to reflect that fact, no taxes would be due. The Receiver has not done this, the Receiver asserts, because the IRS "has blocked every attempt by the receiver to sell all or any portion of the stock to find out." Docket No. 82 at 9. The Receiver does not explain how the IRS has blocked the sale.

### 3. The Distribution Was Not an Interest Payment

The legal issue is whether the distribution constitutes payment of interest due on debt, deductible pursuant to I.R.C. § 163(a), or whether the distribution is actually an equity payment. In order for the distribution to be interest, the IMMI stock purchased through the Receiver's Certificates must represent a loan rather than an investment.

█ The basic distinction between debt and equity has been formulated as follows: "Generally, shareholders place their money 'at the risk of the business' while lenders seek a more reliable return." *Slappey Drive Indus. Park v. United States*, 561 F.2d 572, 581 (5th Cir.1977). In determining whether a transaction involves either debt or equity, courts have considered the following factors:

(1) the names given to the certificates evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date;

(3) the source of payments;

(4) the right to enforce payment of principal and interest;

(5) participation in management flowing as a result;

(6) the status of the contribution in relation to regular corporate creditors;

(7) the intent of the parties;

(8) "thin" or adequate capitalization;

(9) identity of interest between creditor and stockholder;

(10) source of interest payments;

(11) the ability of the corporation to obtain loans from outside lending institutions;

(12) the extent to which the advance was used to acquire capital assets; and

(13) the failure of the debtor to repay on the due date or to seek a postponement.

*Id.* at 582.

█ Certain factors are particularly relevant in this case. *See id.* at 581

("[D]iffering circumstances may bring different factors to the fore."). The language used on the certificates, the absence of a fixed maturing date, and the evident contemporaneous intent of the Receiver are especially telling.

The Receiver's Certificates on their face suggest that the IMMI shares should be considered an investment, rather than interest on a debt. The Series D certificates bear the following warning:

> THE PURCHASER OF ONE OR MORE CERTIFICATES OR SHARES OF IMMI MUST BE PREPARED TO BEAR THE ECONOMIC RISKS OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME BECAUSE NEITHER THE CERTIFICATES NOR THE SHARES HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR STATE SECURITIES LAWS . . . .

Docket No. 71, attachment. This statement clearly categorizes the IMMI shares as "investment." The series A and B certificates do not contain this language. Although this language alone is not dispositive, *see Slappey Drive,* 561 F.2d at 581, it suggests that the IMMI shares represented equity, not interest on a debt.

The conclusion that the promised IMMI shares represented equity is bolstered by the absence of a fixed maturity date. The series A and B certificates, which do not promise IMMI shares, state that they are payable "on or before the termination of the Receivership, at the office of the Receiver." Docket No. 71, attachment. The series D certificate contains the same statement as to the principal and interest. The portion of the series D certificate that promises IMMI stock, in contrast, lacks an analogous obligation to pay at a certain time.

"The courts have indicated that the existence of a fixed maturity date is the most significant feature of a debtor-creditor relationship." *Unitex Indus. v. C.I.R.,* 30 T.C. 468, 473, 1958 WL 1001 (1958). *See also Haffenreffer Brewing Co. v. C.I.R.,* 116 F.2d 465, 468 (1st Cir.1940) ("Perhaps the most significant fact is the lack of a fixed maturity date at which time the holder can demand payment whether or not there are net earnings. This is the essential feature of the debtor-creditor relation."). The absence of a fixed maturity date indicates that "repayment [is] in some way tied to the fortunes of the business, indicating an equity advance." *Lane v. United States,* 742 F.2d 1311, 1315 (11th Cir.1984).

The IRS has also pointed out that the Receiver's contemporaneous reports referred to the Receiver's Certificate holders as "equity pool" claimants. Docket No. 71 at 7–10. The Receiver has not, in these proceedings, made any attempt to explain its own previous characterization of those claimants. I take this as evidence of the parties' intent, at the time that the certificates were issued, that the IMMI stock would represent equity.

The Receiver has not established that the purchase of IMMI stock through the Receiver's Certificates was anything other than an investment. For that reason, the court holds that the Receiver's claimed deduction of $1,321,428 for distribution of the IMCOA stock to Receiver's Certification holders should be disallowed, as determined by the IRS.

## D. Deductions for Mandelman/Lean Stock Expense

### 1. Factual Background

In exchange for the stock in Mandelman's four companies, the Receiver promised Mandelman both cash and IMMI stock. When the IMCOA purchase agreement was made, the Receiver proposed to

distribute 424,029 shares of IMCOA stock, valued at $1 each, to Mandelman and Lean, in place of the promised IMMI stock.

### 2. Parties' Arguments

The Receiver deducted the $424,029 for the Mandelman/Lean stock expense as an ordinary and necessary business expense deductible under § 162.

The IRS disallows this deduction in its entirety. The IRS takes the position that "The payment is a nondeductible liquidating distribution of IMMI's assets in proportion to Mandelman's ownership interest in IMMI." Docket No. 49, Ex. 2 at 18. When Mandelman and Lean received the IMMI stock in exchange for stock in the four companies, the value of the stock was "probably close to zero." Docket No. 49, Ex. 2 at 18. Mandelman and Lean were not promised the sum of $424,029, nor were they promised stock with a guaranteed value of $424,029. In these circumstances, the IMMI stock was more likely an investment than part of the Receiver's cost basis in the stock of the four corporations purchased from Mandelman. The IRS thus views Mandelman and Lean as being in the same position as the Receiver's Certificate holders. Docket No. 49, Ex. 1 at 9.

### 3. The Receiver Has Not Produced Convincing Evidence that the IRS Wrongly Categorized the Mandelman/Lean Stock as a Liquidating Distribution

For the reasons stated in Part IV.C, above, the IMMI stock that Mandelman and Lean received appears to represent an ownership interest in IMMI.

The Receiver has not produced any credible evidence to support its claim that Mandelman and Lean were not IMMI shareholders, but rather creditors of

IMMI paid in IMCOA stock. Docket No. 65 at 6. Indeed, the Receiver's current position appears to be contrary to the Receiver's own earlier reports, which stated that Mandelman was promised stock in IMMI. *See, e.g.,* Docket No. 29, Receiver's 36th Report, at 38. The Receiver has also referred to the promised IMMI shares as an "ownership interest." Docket No. 54 at 4. (This statement by the Receiver refers to the original Mandelman agreement. Although the amount of IMMI shares due to Mandelman was later decreased in the amended settlement agreement, that agreement still provided that Mandelman would receive IMMI shares. Docket No. 54 at 5.)

The Receiver has not identified any documents relating to the Mandelman contract that support its current assertions. The Receiver has stated that no single document memorializes the Mandelman contract. "[T]he transaction had evolved over time and there had been a letter agreement, at least four Court hearings, and other stipulations over a period of three or more years, all of which had to be read together before the entire transaction could be understood." Docket No. 65 at 9 n. 6. Even if true, this assertion does not explain why the Receiver has not provided this court with any of these documents. Absent some evidence that the Receiver's position is correct, the court cannot decide the issue in the Receiver's favor.

As stated above, the burden is on the Receiver to produce some credible evidence challenging the IRS's assessment. The Receiver simply has not produced any evidence that Mandelman and Lean were not promised an ownership interest in IMMI.

### E. Deductions for Finance Committee Members' Stock Expense

The Receiver claimed a deduction of $397,257 for payment to the finance com-

mittee members for their service. The IRS disallowed this deduction in its entirety, because the payment was not made in the year that the Receiver took the deduction. Docket No. 49, Ex. 1 at 9. The IRS explains that the Receivership Court approved

> the percentages of IMMI's remaining assets (the IMCOA stock) to be distributed to the finance committee members. There is no obligation to pay until final distribution is possible and authorized by the court, and it is impossible to determine the number of shares of IM-COA stock they will be paid, or the value of that stock, until economic performance has occurred.

Docket No. 49, Ex. 2 at 4.

 The Internal Revenue Code declares that the taxpayer must deduct a payment for services in the same year that the recipient of the payment takes it into income. 26 U.S.C. § 83(h). The amount included in the recipient's gross income is determined as of "the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture." 26 U.S.C. § 83(a)(1). Thus, an employer may not accrue a deduction for compensation made by stock or options until the payment is in fact distributed irrevocably.

The Receiver admits that it did not in fact pay the finance committee in fiscal year 1999. The Receiver contends that the Receiver is still entitled to the deduction, however, because the Receiver promised to pay the committee members and intended to do so in fiscal year 1999, failing to do so only because the IRS blocked the distribution. Docket No. 65 at 8. The Receiver does not explain how the IRS "blocked the distribution."

The Receiver has not cited any case law to support its claim that an exception exists to Section 83(h) where payment was intended but not made in the year it is claimed as a deduction. Nor does the Receiver explain how the Receiver can set the value of the stock distribution when that distribution will not occur until some unspecified future time, if ever. Thus, I see no grounds on which to hold that the deduction should be allowed.

## F. Conclusion

In summary, each of the Receiver's challenged deductions were improper. The Receiver's taxable income for fiscal year 1999 is therefore increased in accordance with the IRS's adjustments, including the IRS's partial concession with regard to the Motor Claims Expense (Docket No. 106). This leaves the parties to "agree on the amount of tax that results from the [c]ourt's determination of the adjustments to taxable income," as the IRS has suggested. Docket No. 83 at 3.

The IRS has also requested that the court hold that substantial understatement penalties for the Receiver's Certificate, Mandelman/Lean Stock, and Finance Committee Stock deductions are warranted as a matter of law. Docket No. 71. Substantial understatement penalties are warranted in cases of "substantial understatement of income tax." 26 U.S.C. § 6662(b)(2). "Substantial understatement" is understatement that exceeds "10 percent of the tax required to be shown on the return for the taxable year." 26 U.S.C. § 6662(d)(1)(A). A taxpayer may avoid the penalty if substantial authority exists for the taxpayer's position or if the taxpayer adequately disclosed facts relevant to his tax treatment and had a reasonable basis for that tax treatment. 26 U.S.C. § 6662(d)(2)(B).

The court withholds judgment at this time on the contention of substantial un-

derpayment. First, in contravention of the local rules, the IRS has not cited any authority, or indeed made any argument, to support its position that the substantial underpayment is proper as a matter of law. *See* Local Rule 7.1(B). Second, the taxes due have not yet been determined. In this case, because the Receiver claimed on its tax return that no taxes were due, any increase in taxes due may lead to a determination that the Receiver has substantially underpaid according to the statutory definition. Nonetheless, the penalty issue is best addressed after the taxes have been determined and the Receiver has had an opportunity to argue that a penalty is not warranted as a matter of law.

## V. Equitable Subordination

The Receiver asks that, in the event that this court determines that the Receivership estate incurred a tax liability, the court equitably subordinate the IRS's claim against the Receivership to punish the IRS for alleged misconduct. The United States has moved to dismiss the motion.

The court notes that the Receiver has made two requests: "that any taxes due from the Bankruptcy Cases be subordinated to the Receiver's claims [and] that any taxes due in the Receivership Action be subordinated to all other creditors." Docket No. 64 at 36. As to the bankruptcy case, the Receiver lacks standing to move for equitable subordination.

As to the receivership proceeding, a threshold question is whether this court has jurisdiction to "equitably subordinate" the IRS's claims.

The Receiver grounds its request in 11 U.S.C. § 510(c), which states:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

Although § 510(c) is part of the Bankruptcy Code, the Receiver (acknowledging that "bankruptcy law rarely applies to receiverships") maintains that § 510 authorizes equitable subordination in this case because legislative history "make[s] it clear that § 510(c) codified the existing law of equity courts, and that § 510(c) would be developed under those previously-developed principles of equity by case law in the future." Docket No. 64 at 3.

The Receiver's position would be more persuasive were the court aware of any receivership cases that support it, decided before or after the enactment of § 510(c), in which a court ordered equitable subordination of a tax claim. The Receiver has not identified a single case in which a tax claim was equitably subordinated in a receivership proceeding, and the United States reports that it was unable to identify any such cases either. Without such cases, no reason exists to believe that "principles of equitable subordination" ever encompassed equitable subordination of tax claims in receivership cases. In these circumstances, the "previously developed principles of equity" do not appear to include equitable subordination of tax claims in receivership cases.

 In addition to the absence of case law, another obstacle to equitable subordination is sovereign immunity. "The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be

sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) (citations omitted). Ordinarily, sovereign immunity bars judicial subordination of a federal claim in comparison to its statutory priority. *See generally SEC v. Credit Bancorp, Ltd.*, 297 F.3d 127 (2d Cir.2002). In the case of equitable subordination pursuant to Section 510(c), Congress explicitly waived sovereign immunity in Section 106(a) of the Bankruptcy Code, which provides that "sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to Section[ ] ... 510 ... of this title." The fact that Congress acted on the premise that it had to waive sovereign immunity explicitly indicates that sovereign immunity generally obtains. The waiver in Section 106(a) applies only in bankruptcy proceedings. *Northland Assoc., Inc. v. United States*, 160 B.R. 484, 490 (N.D.N.Y.1993). "A waiver of sovereign immunity will not be implied ... where Congressional consent is not clear." *In re Ernst & Young, Inc.*, 135 B.R. 521, 523 (S.D.Oh.1991). Because any waiver of sovereign immunity must be explicit, this court cannot extend the waiver in Section 106(a) to reach the receivership action in this case.

 The Receiver appears to suggest that because the IRS filed claims in the receivership action, it waived sovereign immunity. Docket No. 84 at 9. Section 106(b) of the Bankruptcy Code provides that a "governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose." For the reasons stated above, however, Section 106(b) does

not apply to this receivership action, and the waiver of sovereign immunity cannot be extrapolated to receivership cases. The Receiver may, alternatively, intend to argue that the IRS's assessment of taxes against the Receivership waives sovereign immunity. The Receiver has not cited any case law to support this position, however, and this court has been unable to find any.

## VI. Other Matters

The court defers decision on all other pending matters, including the Receiver's attempts to reform the Mandelman contract and recover levied funds; the Receiver's request for an order of recoupment; and the parties' various accusations of misconduct against one another.

### Practice and Procedure Order No. 5

For the reasons explained above, it is ORDERED:

(1) Receiver's Motion to Strike One Government Claim for Taxes (Docket No. 23) is DENIED;

(2) Decision on the Receiver's Motion for Order Approving Payment of Professionals (Docket No. 24) is DEFERRED;

(3) Receiver's Motion for Order Approving Recoupment Notice to Beneficiaries of the Receivership Estate (Docket No. 25) has been WITHDRAWN;

(4) Motion of Chapter 7 Bankruptcy Trustee for Order Authorizing and Approving Settlement Agreement with United States of America (Docket No. 51) is ALLOWED to the extent stated in the Memorandum of this date;

(5) Receiver's Motion to Allow Filing of Oversize Response Brief Regarding Taxes (Docket No. 52) was ALLOWED by marginal order on May 28, 2003;

(6) Decision on Motion of United States (1) To Strike [DI# 54] Receiver's Effort to Circumvent Failure to Comply with Court

Orders and Deadlines by Purporting to "Notice" Other Parties' Motions and (2) To Enter Default–Dismissal of Receiver's Motion to Reform Mandelman Contract and Recover Levied Funds (Docket No. 58) is DEFERRED;

(7) Decision on Motion of United States to Preserve Certain Important Pre–Trial Rights if the Court Allows the Receiver's Reformation/Wrongful–Levy Motion to Go Forward (Docket No. 61) is DEFERRED;

(8) Receiver's Motion for Equitable Subordination of the United States' Claims Against the Receivership Estate and the Bankruptcy Cases (Docket No. 64) is DENIED;

(9) United States' Motion to Dismiss, for Lack of Jurisdiction and Other Reasons, the Requests for Equitable Subordination Included as Point 8 in [DI# 48] the Receiver's Opening Substantive Submission (Docket No. 69) is DISMISSED;

(10) Decision on Motion of Michael Mandelman (1) To Strike [DI# 54] Receiver's Effort to Circumvent Failure to Comply with Court Orders and Deadlines by Purporting to "Notice" Other Parties' Motions and (2) To Enter Default–Dismissal of Receiver's Motion to Reform Mandelman Contract and Recover Levied Funds (Docket No. 73) is DEFERRED;

(11) Decision on Motion of Michael Mandelman to Preserve Certain Important Pre–Trial Rights if the Court Allows the Receiver's Reformation/Wrongful–Levy Motion to Go Forward (Docket No. 75) is DEFERRED;

(12) Receiver's Motion (1) That IRS Fully Brief for the Court All the Tax Implications in the Receivership of the Proposed Bankruptcy Settlement; and (2) For Extension of Time to Respond to Proposed Bankruptcy Settlement Until After IRS Brief Is Filed (Docket No. 80) is DENIED;

(13) Decision on U.S. Motion (1) To Strike That Part of DI# 66 Which Seeks a Declaratory Judgment Regarding Sterling's Liability Under 31 U.S.C. § 3713, and (2) to Dismiss Remainder (Raising Issues of Transferee Liability) for Lack of Ripeness (Docket No. 86, filed March 7, 2003) is DEFERRED;

(14) Renewal of United States' Motion to Dismiss, for Lack of Jurisdiction and Other Reasons, the Receiver's Expanded and Reformulated "Motion" for Equitable Subordination [DI# 64], and (2) Supplement, Raising Lack of Ripeness (Docket No. 88, filed March 7, 2003) is DENIED;

(15) Receiver's Motion for Sanctions Against the Trustee and the Government and Preliminary Objection to the Settlement Between the Government and the Trustee (Docket No. 95) is DENIED;

(16) Receiver's Motion for Declaratory Relief and Preliminary Objection to IRS/Trustee Settlement Agreement (Docket No. 96) is DENIED;

(17) Decision on United States' Motion to Strike Mr. Tanner's Fabrication (in DI # 79) Designed to Manufacture Yet Another Allegation of "Misconduct" Against Government Counsel and Request that Court Admonish Mr. Tanner to Cease the Incivility (Docket No. 98) is DEFERRED;

(18) Motion by Stephen Rodolakis for Leave to File in Excess of Page Limit (Docket No. 109, filed March 28, 2003) was ALLOWED by marginal order of May 27, 2003;

(19) Motion by Sterling Consulting to Appear Telephonically at Hearing on May 1, 2003 (Docket No. 119, filed April 14, 2003) was WITHDRAWN;

(20) Decision on Motion by Sterling Consulting for Order Requiring Recoupment from Certain Beneficiaries of the

Receivership Estate (Docket No. 122) is DEFERRED; and

(21) Decision on Motion by Sterling Consulting to Separate Issues Regarding Mr. Mandelman's Alleged Fraud on the Receivership Court and Related Issues from Remainder of the Receivership Case (Docket No. 125) is DEFERRED.

(22) The court acknowledges the Receiver's Notice of Imminent Expiration of Receiver's Bond and Request for Instructions (Docket No. 116, filed April 9, 2003) and notes the expiration of the Receiver's Bond.

(23) The court makes a preliminary ruling that the Receiver's claimed fiscal year 1999 tax deductions for the Motor Claims, Receiver's Certificate, Mandelman/Lean Stock, and Finance Committee Stock expenses are improper. Taxes due are to be determined on the basis of the adjusted taxable income.

(24) The **next CMC** is set for **Tuesday, July 15, 2003 at 10:00 a.m.**